BOARD OF GOVERNORS OF THE FEDERAL RESERVE SYSTEM ET AL. *v.* AGNEW ET AL.

No. 66. Argued December 10, 1946.—Decided January 6, 1947.

*J. Leonard Townsend* argued the cause for petitioners. With him on the brief were *Solicitor General McGrath, Robert L. Stern* and *George B. Vest.*

*Hugh H. Obear* argued the cause and filed a brief for respondents.

MR. JUSTICE DOUGLAS delivered the opinion of the Court.

This case, here on certiorari to the Court of Appeals of the District of Columbia, presents important problems under § 30 and § 32 of the Banking Act of 1933, 48 Stat. 162, 193, 194, as amended, 49 Stat. 684, 709, 12 U. S. C. §§ 77, 78.

Section 30 of the Act provides that the Comptroller of the Currency, whenever he is of the opinion that a director or officer of a national bank has violated any law relating to the bank, shall warn him to discontinue the violation and, if the violation continues, may certify the facts to the Board of Governors of the Federal Reserve System. The Board is granted power to order that the director or officer be removed from office if it finds after notice and a reasonable opportunity to be heard that he has continued to violate the law.[1]

Section 32 of the Act prohibits, *inter alia,* any partner or employee of any partnership "primarily engaged in the issue, flotation, underwriting, public sale, or distribution, at wholesale or retail, or through syndicate participation, of stocks, bonds, or other similar securities" from serving at the same time as an officer, director, or employee of a member bank.[2]

---

[1] Section 30 also provides:

"That such order and the findings of fact upon which it is based shall not be made public or disclosed to anyone except the director or officer involved and the directors of the bank involved, otherwise than in connection with proceedings for a violation of this section. Any such director or officer removed from office as herein provided who thereafter participates in any manner in the management of such bank shall be fined not more than $5,000, or imprisoned for not more than five years, or both, in the discretion of the court."

[2] Not material here is an exception "in limited classes of cases in which the Board of Governors of the Federal Reserve System may

Pursuant to the procedure outlined in § 30 the Board ordered respondents removed from office as directors of the Paterson National Bank on the ground that they were employees of a firm "primarily engaged" in underwriting within the meaning of § 32. Respondents brought suit in the District Court for the District of Columbia to review the action of the Board or to enjoin its action. The District Court dismissed the complaint. The Court of Appeals reversed by a divided vote, holding that the Board exceeded its authority and that an injunction should issue. 153 F. 2d 785.

*First.* The Board contends that the removal orders of the Board made under § 30 are not subject to judicial review in the absence of a charge of fraud. It relies on the absence of an express right of review and on the nature of the federal bank supervisory scheme of which § 30 is an integral part. Cf. *Adams* v. *Nagle,* 303 U. S. 532; *Switchmen's Union* v. *Mediation Board,* 320 U. S. 297; *Estep* v. *United States,* 327 U. S. 114. A majority of the Court, however, is of the opinion that the determination of the extent of the authority granted the Board to issue removal orders under § 30 of the Act is subject to judicial review and that the District Court is authorized to enjoin the removal if the Board transcends its bounds and acts beyond the limits of its statutory grant of authority. See *American School of Magnetic Healing* v. *McAnnulty,* 187 U. S. 94; *Philadelphia Co.* v. *Stimson,* 223 U. S. 605, 620; *Stark* v. *Wickard,* 321 U. S. 288, 309–310. That being decided, it seems plain that the claim to the office of director is such a personal one as warrants judicial consideration of the controversy. Cf. *Columbia Broadcasting System* v.

allow such service by general regulations when in the judgment of the said Board it would not unduly influence the investment policies of such member bank or the advice it gives its customers regarding investments." § 32.

*United States,* 316 U. S. 407; *Stark* v. *Wickard, supra,* p. 305.

*Second.* We come then to the merits. Respondents for a number of years have been directors of the Paterson National Bank, a national banking association and a member of the Federal Reserve System. Since 1941 they have been employed by Eastman, Dillon & Co., a partnership, which holds itself out as being "Underwriters, Distributors, Dealers and Brokers in Industrial, Railroad, Public Utility and Municipal Securities." During the fiscal year ending February 28, 1943, its gross income from the underwriting field [3] was 26 per cent of its gross income from all sources, while its gross income from the brokerage business was 42 per cent of its gross income from all sources. The same percentages for the fiscal year ending February 29, 1944, were 32 per cent and 47 per cent respectively; and for the period from March 1, 1944, to July 31, 1944, 39 per cent and 40 per cent respectively. Of the total number of transactions, as well as the total market value of the securities bought and sold by the firm as broker and as dealer for an indefinite period prior to September 20, 1943, about 15 per cent were in the underwriting field. The firm is active in the underwriting field, getting what business it can. In 1943 it ranked ninth among 94 leading investment bankers in the country with respect to its total participations in underwritings of bonds. For a time during 1943 it ranked first among the underwriters of the country. Apart from municipals and rails, its participation in underwritings during 1943 amounted to $14,657,000. Since October, 1941, respondents have done no business with the bank other than a strictly commission business with its custom-

---

[3] The issue, flotation, underwriting, public sale or distribution, at wholesale or retail or through syndicate participation, of stocks, bonds or other similar securities. The firm does not deal in United States Government bonds.

ers. Nor has the firm done business with the bank since the fall of 1941.

These are the essential facts found by the Board.

On the basis of these facts the Board concluded that during the times relevant here Eastman, Dillon & Co. was "primarily engaged" in the underwriting business and that respondents, being employees of the firm, were disqualified from serving as directors of the bank.

The Court of Appeals concluded that when applied to a single subject "primary" means first, chief, or principal; that a firm is not "primarily engaged" in underwriting when underwriting is not by any standard its chief or principal business. Since this firm's underwriting business did not by any quantitative test exceed 50 per cent of its total business, the court held that it was not "primarily engaged" in the underwriting business within the meaning of § 32 of the Act.

We take a different view. It is true that "primary" when applied to a single subject often means first, chief, or principal. But that is not always the case. For other accepted and common meanings of "primarily" are "essentially" (Oxford English Dictionary) or "fundamentally" (Webster's New International). An activity or function may be "primary" in that sense if it is substantial. If the underwriting business of a firm is substantial, the firm is engaged in the underwriting business in a primary way, though by any quantitative test underwriting may not be its chief or principal activity. On the facts in this record we would find it hard to say that underwriting was not one primary activity of the firm and brokerage another. If "primarily" is not used in the sense we suggest, then the firm is not "primarily engaged" in any line of business though it specializes in at least two and does a substantial amount of each. One might as well say that a professional man is not "primarily engaged" in his profession though he holds himself out to serve all comers and devotes substan-

tial time to the practice but makes the greater share of his income on the stock market.

That is the construction given the Act by the Board. And it is, we think, not only permissible but also more consonant with the legislative purpose than the construction which the Court of Appeals adopted. Firms which do underwriting also engage in numerous other activities. The Board indeed observed that, if one was not "primarily engaged" in underwriting unless by some quantitative test it was his principal activity, then § 32 would apply to no one. Moreover, the evil at which the section was aimed is not one likely to emerge only when the firm with which a bank director is connected has an underwriting business which exceeds 50 per cent of its total business. Section 32 is directed to the probability or likelihood, based on the experience of the 1920's, that a bank director interested in the underwriting business may use his influence in the bank to involve it or its customers in securities which his underwriting house has in its portfolio or has committed itself to take. That likelihood or probability does not depend on whether the firm's underwriting business exceeds 50 per cent of its total business. It might, of course, exist whatever the proportion of the underwriting business. But Congress did not go the whole way; it drew the line where the need was thought to be the greatest. And the line between substantial and unsubstantial seems to us to be the one indicated by the words "primarily engaged."

There is other intrinsic evidence in the Banking Act of 1933 to support our conclusion. Section 20 of the Act outlaws affiliation [4] of a member bank with an organization "engaged principally" in the underwriting business.

---

[4] Defined in § 2 (b) as direct or indirect ownership or control of more than 50 per cent of the voting stock of the organization in question, common ownership or control of 50 per cent or more of such voting stock, or a majority of common directors.

Section 19 provides control over bank holding companies. In order to vote its stock in controlled banks a bank holding company must show that it does not own, control, or have any interest in, and is not participating in the management or direction of any organization "engaged principally" in the underwriting business. On the other hand, when Congress came to deal with the practice of underwriters taking checking deposits, it used language different from what it used either in §§ 19 and 20 on the one hand or in § 32 on the other. By § 21 it prohibited any organization "engaged" in the underwriting business "to engage at the same time to any extent whatever" in the business of receiving checking deposits. Thus within the same Act we find Congress dealing with several types of underwriting firms—those "engaged" in underwriting, those "primarily engaged" in underwriting, those "engaged principally" in underwriting. The inference seems reasonable to us that Congress by the words it chose marked a distinction which we should not obliterate by reading "primarily" to mean "principally."

The Court of Appeals laid some stress on the fact that Congress did not abolish the bank affiliate system but only those underwriter affiliates which were under the control of a member bank or which were under a common control with it.[5] Section 20. Since Congress made majority control critical under § 20, it was thought that under § 32 a firm was not "primarily engaged" in underwriting unless underwriting constituted a majority of its business. But the two situations are not comparable. In § 32 Congress was not dealing with the problem of control of underwriters by banks or *vice versa*. The prohibited nexus is in no way dependent on the presence or absence of control, nor would it be made so even if "primarily engaged" in underwriting were construed to mean princi-

---

[5] See note 4, *supra*.

pally engaged in that business. Section 32 was designed, as we have said, to remove tempting opportunities from the management and personnel of member banks. In no realistic sense do those opportunities disappear merely because the underwriting activities of the outside firm with which the officer, director, or employee is connected happens to fall below 51 per cent. Fifty-one per cent, which is relevant in terms of control, is irrelevant here. The fact then that Congress did not abolish underwriter affiliates serves as no guide in determining whether "primarily engaged" in underwriting as used in § 32 means principally engaged or substantially engaged in that business.

Section 32 is not concerned, of course, with any showing that the director in question has in fact been derelict in his duties or has in any way breached his fiduciary obligation to the bank. It is a preventive or prophylactic measure. The fact that respondents have been scrupulous in their relationships to the bank is therefore immaterial.

There is a suggestion that if "primarily" does not mean principally but merely connotes substantiality, § 32 constitutes an unlawful delegation of authority to the Board. But we think it plain under our decisions that if substantiality is the statutory guide, the limits of administrative action are sufficiently definite or ascertainable so as to survive challenge on the grounds of unconstitutionality. *Sunshine Anthracite Coal Co.* v. *Adkins,* 310 U. S. 381, 397–400; *Opp Cotton Mills* v. *Administrator,* 312 U. S. 126, 142–146; *Yakus* v. *United States,* 321 U. S. 414, 424–428; *Bowles* v. *Willingham,* 321 U. S. 503, 512–516.

*Reversed.*

MR. JUSTICE RUTLEDGE, concurring.

If the question presented on the merits is reviewable judicially, in my opinion it is only for abuse of discretion

by the Board of Governors. Not only because Congress has committed the system's operation to their hands, but also because the system itself is a highly specialized and technical one, requiring expert and coordinated management in all its phases, I think their judgment should be conclusive upon any matter which, like this one, is open to reasonable difference of opinion. Their specialized experience gives them an advantage judges cannot possibly have, not only in dealing with the problems raised for their discretion by the system's working, but also in ascertaining the meaning Congress had in mind in prescribing the standards by which they should administer it. Accordingly their judgment in such matters should be overturned only where there is no reasonable basis to sustain it or where they exercise it in a manner which clearly exceeds their statutory authority.

In this case I cannot say that either of these things has occurred. The Board made its determination after the required statutory hearing on notice. 48 Stat. 162, 193, 12 U. S. C. § 77. The consideration given was full and thorough, including detailed findings of fact and conclusions of law, followed by a carefully written opinion.[1] The Board concluded that "primarily" in § 32 does not mean "first in volume in comparison with any other business or businesses in which it [the employer] engages,"[2] but

---

[1] The opinion is not reported, pursuant to the statutory prohibition, 12 U. S. C. § 77, which is effective except in connection with proceedings for enforcement.

[2] Under such a view, in cases involving different facts the question would become judicial whether "primarily" means more than half of (1) the gross volume of business done; (2) the gross profit; (3) the net profit, where some but not all these factors as relating to one phase of the total activities carried on amounts to more than half the gross. Such discriminations would seem to be clearly within the Board's power to determine in the first instance. If so, it is difficult to see why that power does not include the determination made here.

means rather as "a matter of primary importance," like "primary" colors or planets or as the word is used in the phrase "the primary causes of a war." This view it found not only supported by accepted dictionary meaning but also in conformity with Congress' intent as established by the legislative history. In a further ground which we must take as reflecting its specialized experience, the Board stated: "To say that a securities firm ranking ninth among the leading investment bankers of the country with respect to its total participations in underwritings of bonds, and for a period ranking first, should be held to be beyond the scope of the statute is to say that Congress enacted a statute with the intention that it would apply to no one."

I cannot say that the Board's conclusion, in the light of those groundings, is wanting either for warrant in law or for reasonable basis in fact. The considerations stated in the Court's opinion and in the dissenting opinion filed in the Court of Appeals, 153 F. 2d 785, 795, as well as by the Board itself, confirm this view. I think it important, not only for this case but for like ones which may arise in the future, perhaps as a result of this decision, to make clear that my concurrence in the Court's disposition of the case is based upon the ground I have set forth, and not upon independent judicial determination of the question presented on the merits. I do not think this Court or any other should undertake to reconsider, as an independent judgment, the Board's determination upon that question or similar ones likely to arise, if the Board was not without basis in fact for its judgment and does not clearly transgress a statutory mandate. More than has been shown here would be required to cause me to believe that the Board has exceeded its power in either respect.

MR. JUSTICE FRANKFURTER joins in this opinion.