## SOUTH CAROLINA PUBLIC SERVICE AUTHORITY v. FEDERAL POWER COMMISSION.
### No. 6460.

United States Court of Appeals
Fourth Circuit.

Argued Oct. 15, 1952.

Decided Nov. 12, 1952.

Robert McC. Figg, Jr., Charleston, S. C. (W. D. Simpson, Moncks Corner, S. C., on the brief), for petitioner.

Willard W. Gatchell, Asst. Gen. Counsel, Federal Power Commission, Washington, D. C. (Bradford Ross, Gen. Counsel, and John C. Mason, Atty., Federal Power Commission, Washington, D. C., on the brief), for respondent.

Before PARKER, Chief Judge, and SOPER and DOBIE, Circuit Judges.

SOPER, Circuit Judge.

South Carolina Public Service Authority seeks review of an order of the Federal Power Commission of February 13, 1952 wherein the Commission found that the Santee-Cooper project, established by the Authority, was not primarily designed to promote or improve navigation, and was therefore not entitled to exemption from the annual charges imposed by the Commission for the years 1942 to 1947 to re-

imburse the United States for the costs of administration, within the meaning of § 10(e) of the Federal Power Act, 16 U.S.C. A. § 803(e).

South Carolina Public Service Authority is a body corporate created by an Act of the General Assembly of South Carolina in 1934, S.C.Code 1942, §§ 8555–11 to 8555–24 and thereby endowed with power to develop the Cooper River, the Santee River and the Congaree River as instrumentalities of commerce and navigation and to produce and sell electric power and to reclaim and drain swampy and flooded lands. The Act declared that the Authority was created primarily for the purpose of developing the Cooper River, the Santee River, the Congaree River and their tributaries as instrumentalities of commerce and navigation, of reclaiming waste lands by control of flood waters, reforesting water sheds, and improving public health conditions. The Authority is conceded to be a municipality under the definition contained in § 3(7) of the Federal Power Act, and is entitled to claim exemption under § 10(e) of the Act.

The enterprise, now known as the Santee-Cooper project, was first proposed by the Columbia Railway and Navigation Company in 1919, and permission to prosecute it was sought from Congress. On March 28, 1921, after the passage of the Federal Power Act, 16 U.S.C.A. § 791a et seq., an application for preliminary permit to prosecute the work was filed by the Navigation Company and was granted by the Commission. The scheme contemplated the building of a canal, 24 miles in length, to connect the Santee River with the head waters of the Cooper River, to divert all the waters of the Santee River, except a small portion of the flow through the canal into the Cooper River, so as to provide direct water connection between Columbia, South Carolina, and Charleston, South Carolina. The project also contemplated the building of a hydroelectric plant near the southern terminus of the canal to supply electric current for power and light in Charleston and other cities and towns. The declared purpose of the directors of the enterprise was the improvement of navigation by the canal and the development of enough hydroelectric power to pay for the canal.

Sixteen years later the project was described in detail in the opinion of the late Judge J. Lyles Glenn in Carolina Power & Light Co. v. South Carolina Public Service Authority, D.C.E.D.S.C., 20 F.Supp. 854, and the great importance of shortening the distance by water between Charleston and Columbia by 100 miles through the construction of the project was emphasized. This decision was affirmed on appeal by this court in Carolina Power & Light Co. v. South Carolina Public Service Authority, 4 Cir., 94 F.2d 520, 522, where the project was described as follows:

"* * * The Santee and Cooper are navigable rivers, the navigable portions of which lie wholly within the state of South Carolina. While they are navigable for a considerable distance, the navigation which they carry at this time is of an entirely negligible character. It is proposed by means of the project to provide an improved water route from Columbia to Charleston which will really be useful for purposes of navigation, and which will shorten the distance of water transportation between these cities from 246 to 145 miles, and at the same time to construct a hydroelectric power plant capable of producing annually 450,000,000 kwh of primary power and 200,000,000 kwh of secondary power. This is to be accomplished by constructing a diversion dam at Wilson's Landing in the Santee, about 87 miles above its mouth, and diverting the flow of that river, with the exception of about 500 c. f. s., through a canal into the Cooper. A power dam, with appropriate navigation locks, is to be constructed in the latter river at Pinopolis, and by the use of appropriate electrical generating machinery the potential energy of the impounded water is to be converted into electric current.

"The result of the construction of the project will be to decrease the navigable capacity of the Santee be-

low the diversion dam; but provision is made in the license granted therefor to take care of any future need of navigation in that part of the river by providing that the flow below the dam shall be increased by releasing such additional quantities of water as in the opinion of the Chief of Engineers of the War Department and the Secretary of War may be necessary for the proper operation of navigation facilities to be provided by the government. The project has been authorized by the South Carolina Legislature by Act 887 of the General Assembly of 1934, which has been upheld as constitutional by the Supreme Court of South Carolina. Clarke v. South Carolina Public Service Authority, 177 S.C. 427, 181 S.E. 481. It has been licensed also by the Federal Power Commission, after approval by the Chief of Engineers of the War Department and the Secretary of War. It appears also that Congress, after being advised as to the project and the earmarking of funds for the loan and grant in aid thereof, has appropriated additional funds for carrying it on. Public Resolution No. 47, 75th Cong., June 29, 1937, c. 401, § 205(e), 15 U.S.C.A. § 728 note. See also Senate Document 184, 74th Cong., 2d Sess. p. 11, and 81 Cong. Rec. 6054 and 81 Cong.Rec. 8304."

After this litigation, certain work was performed upon the project and in 1939 the license granted by the Federal Power Commission was acquired by the Authority from the Navigation Company for the sum of $439,613.63, and the transfer was approved by an Act of the General Assembly of South Carolina. (See § 8555-27 of the South Carolina Code of 1942); and the Authority was empowered "to construct the Santee-Cooper hydroelectric and navigation project as outlined and described in said license and amendments and on license drawings prepared and filed with (the) Federal Power Commission. * * *"

The project as now constructed under the original permit and amendments thereto is described in some detail in the Commission's opinion. The Authority points to evidence with respect to improvement in navigation as follows: There is now a minimum depth of 10 feet for navigation from Charleston Harbor to the headwaters of the Santee River at the confluence of the Congaree and Wateree Rivers, a distance of 120 miles, and a like depth will exist on the Congaree to Columbia when other dams are constructed which are included in the plans for the development of the Santee system and have been approved by the Commission. Navigation from Charleston to Georgetown, about 60 miles is through the intracoastal waterway with a minimum depth of 12 feet and the sailing time from Columbia to Georgetown has been greatly reduced by the project through the avoidance of 87 miles of the shifting and tortuous channel of the lower Santee. In the period subsequent to the acquisition of the license by the Authority, various changes have been made by which navigation has been improved. Navigation channels in the Santee Reservoir and in the diversion canal have been deepened. The removal and reconstruction of bridges obstructing navigation have been accomplished by the expenditure of approximately $1,732,000. The lock at the dam has been constructed at a cost of approximately $1,652,000; and the Cooper River has been dredged, deepened and widened at a cost of $2,000,000. The navigable depth of the dredged channel is 4 to 8 feet deeper than the irregular natural channel. It was estimated in 1934 that the cost of the project as a water way without the power plant would be $21,500,000.

Commerce on the improved waterways has not been extensive. The Authority points out that 772 tons of stone were moved from 1947 to May 1949 by a fleet of seventy boats of which fifteen were 35 feet in width and 160 feet long. There was wide use of the waterways by heavy cargo boats, which did not pass through the lock, and there was local navigation by fishing boats, motor boats and sail boats which passed through the lock infrequently. However, other than the movement of stone from a point near Columbia for placement in the dams and dykes of the project there has been little or no commercial naviga-

tion on the Congaree River between Columbia and the site of the project at the headwaters of the Santee. In the period between January 1, 1945 and November 25, 1949 only 365 of a total of 4,217 lockages passed vessels other than those used in connection with the movement of stone for the project.

On the other hand the Commission points to evidence tending to show that during the period when the project was in the hands of the Navigation Company various changes were made in the plans with the Commission's approval which were designed to facilitate the power project and tended to diminish the benefits to navigation flowing from the proposed project; and that the changes made after the Authority took over the work have not materially affected the design so far as navigation is concerned.

An electric power plant of substantial size and importance has been created. There are 132,000 kw of capacity installed in the project. The dependable capacity, as determined under the most adverse water condition, is 88,000 kw which is the load limit to be considered in making contracts for the sale of firm capacity and energy. The maximum demands on the project for each of the years 1943 through 1946 exceeded 88,000 kw for a portion of the time. The power revenue during the year 1948 was $2,971,064.

The total sum spent or alloted to be spent on the Santee-Cooper project was stated by the Authority in its twelfth annual report (July 1, 1946–June 30, 1947) to be $64,879,000 of which $35,385,000 was furnished or to be furnished by the United States as a grant and $29,494,000 as a loan. This total may be contrasted with the estimate of the Chief Engineer of the Authority that the navigation facilities provided by the project if undertaken as an independent project would cost $21,500,000.

It is a fair summary of the evidence to say that originally the primary purpose of the Navigation Company and later of the Authority was the improvement of navigation and that the power project, was undertaken as a subsidiary enterprise whose earnings would contribute to the expense of the main object. But it is also true that in the course of the years the practicability and importance of the development of electric power became increasingly manifest and changes were made in the plans which tended to diminish the navigational and increase the power element of the project. Moreover, the completion of the power plant and its successful operation during the years included in this controversy, while the improvement of navigation remained inadequate and still awaits completion in the indefinite future, justifies the conclusion that in this period the production of power rather than the promotion of navigation has constituted the major part of the whole.

These facts disclose a vast difference between the Santee-Cooper project and the construction of the Illinois Waterway which, as the legislative history shows, led Congress in 1919 to adopt an amendment to the bill creating the Federal Power Commission, exempting state or municipal projects primarily designed for navigation purposes from the annual administrative charges imposed by the Federal Power Act; for in Illinois $96,000,000 of state money was spent in the construction of a canal 65 miles long to make a continuous chain of navigation from the Great Lakes to the Mississippi River, and the development of power in the course of construction was only incidentally involved.

 We reach the conclusion that the finding of the Commission upon the facts of the pending case was supported by substantial evidence and hence is binding upon us. Federal Power Act, § 313(b); Administrative Procedure Act, § 10(e), 5 U.S. C.A. § 1009(e); United States ex rel. Chapman v. Federal Power Comm. 4 Cir., 191 F.2d 796, 808.

The authority contends that we should adopt the construction given to the word "primarily" in the decision of the Supreme Court in Board of Governors of Federal Reserve System v. Agnew, 329 U.S. 441, 67 S.Ct. 411, 91 L.Ed. 408. In that case the court construed § 32 of the Banking Act of 1933, 12 U.S.C.A. § 78, which prohibited

**82**

any partner or employee of a partnership primarily engaged in underwriting of stocks, bonds or other similar securities, from serving as an officer or director of a member bank, and the court held that an employee of a partnership was disqualified whose gross income in the underwriting field was substantial but constituted only 26 to 39% of the whole. The court said, 329 U.S. at page 446, 67 S.Ct. at page 414:

"* * * It is true that 'primary' when applied to a single subject often means first, chief, or principal. But that is not always the case. For other accepted and common meanings of 'primarily' are 'essentially' (Oxford English Dictionary) or 'fundamentally' (Webster's New International). An activity or function may be 'primary' in that sense if it is substantial. If the underwriting business of a firm is substantial, the firm is engaged in the underwriting business in a primary way though by any quantitative test underwriting may not be its chief or principal activity. On the facts in this record we would find it hard to say that underwriting was not one primary activity of the firm and brokerage another."

The intent of the Banking Act to disqualify from membership from the board of a national bank any one whose business was inconsistent with such membership was clearly manifest, and the word "primarily" in the statute took its color from this salutary purpose; but the reasoning which justified the court's interpretation in that case does not prevail here. It seems clear to us that Congress intended to exempt from the charges imposed by § 10(e) of the Federal Power Act only state or municipal projects in which the greater part of the project is concerned with navigation, and that where, as in the pending case, the production of electric power constitutes the major element for the period during which the charges are imposed, the exemption of the section does not apply.

Affirmed.