903 F.2d 1
 284 U.S.App.D.C. 184, 20 Envtl. L. Rep. 21,084
 KERR-McGEE CHEMICAL CORPORATION, Petitioner,
v.
U.S. NUCLEAR REGULATORY COMMISSION and United States of
America, Respondents, State of Illinois, Intervenor.
PEOPLE OF the STATE OF ILLINOIS, Petitioner,
v.
USA & Nuclear Regulatory Commission, Respondents.
 Nos. 87-1254, 88-1636, 88-1726.
 United States Court of Appeals,
District of Columbia Circuit.
 Argued Nov. 14, 1989.
Decided April 27, 1990.
 
 Richard A. Meserve, with whom Peter J. Nickels and Sonya D. Winner, Washington, D.C., were on the brief, for petitioner Kerr-McGee Chemical Corp.
 William D. Seith, with whom J. Jerome Sisul was on the brief, for People of the State of Ill., petitioner in No. 88-1726 and intervenor in Nos. 87-1254 and 88-1636. Roma J. Stewart and Russell R. Eggert, Chicago, Ill., also entered appearances for intervenor.
 Steven F. Crockett, Attorney, Nuclear Regulatory Com'n ("NRC"), with whom Peter R. Steenland, Jr., Jacques B. Gelin, and Angus E. Crane, Attorneys, Dept. of Justice, Washington, D.C., and William C. Parler, General Counsel, Baltimore, Md., and E. Leo Slaggie, Acting Sol., NRC, Washington, D.C., were on the brief, for respondents. William H. Briggs, Jr., E. Leo Dashher, and Martin G. Malsch, Attorneys, NRC, and Vicki Plant and Dirk D. Snell, Attorneys, Dept. of Justice, Washington, D.C., also entered appearances for respondents.
 Before MIKVA, BUCKLEY, and D.H. GINSBURG, Circuit Judges.
 Opinion for the court filed by Circuit Judge BUCKLEY.
 BUCKLEY, Circuit Judge:
 
 
 1
 The Kerr-McGee Chemical Corporation ("Kerr-McGee") petitions for review of a decision of the Nuclear Regulatory Commission ("NRC" or "Commission") approving an agreement transferring jurisdiction to the State of Illinois over certain radioactive materials located within that state. Kerr-McGee also petitions for review of a subsequent proceeding conducted by the Commission to determine whether radioactive waste materials located at Kerr-McGee's West Chicago, Illinois facility are "byproduct material" or "source material" within the meaning of sections 11(e) and 11(z) of the Atomic Energy Act, as amended ("AEA"), 42 U.S.C. Secs. 2014(e), 2014(z) (1982). Illinois seeks review of this latter proceeding as well and appears as an intervenor in Kerr-McGee's petitions.
 
 
 2
 These cases challenge the Commission's interpretation of the definition of "byproduct material" found in section 11(e)(2) of the AEA, 42 U.S.C. Sec. 2014(e)(2). While the Commission's construction appears plausible enough on its face, a statute must be read with an eye on its structure and purpose as well as a dictionary. When the Commission's interpretation is considered in the context of the AEA's structure, the purposes of the Uranium Mill Tailings Radiation Control Act of 1978 ("UMTRCA"), Pub.L. No. 95-604, 92 Stat. 3021 (codified in scattered sections of 42 U.S.C.), which added section 11(e)(2) to the AEA, and its application to the wastes at Kerr-McGee's West Chicago facility, it is clear that the Commission's interpretation is impermissible. It frustrates the twin purposes of the UMTRCA by recreating a gap in NRC licensing authority that the UMTRCA was designed to close and by placing certain radioactive wastes--the "offsite material"--outside of the regulatory regime established by the UMTRCA to deal with the health hazards posed by uranium and thorium mill tailings. We therefore grant the petitions for review of the NRC's second proceeding and remand for further consideration consistent with this opinion.
 
 I. BACKGROUND
 A. Statutory Framework
 
 3
 The AEA, as enacted in 1954, was intended to facilitate the development, use, and control of atomic energy. See AEA Secs. 1, 3, 68 Stat. 919, 921-22 (codified at 42 U.S.C. Secs. 2011, 2013). It established the Atomic Energy Commission ("AEC"), the forerunner of the NRC, id. Sec. 21, 68 Stat. at 924 (repealed by Energy Reorganization Act of 1974, Sec. 104(a), 88 Stat. 1233, 1237 (transferring functions to NRC)), and gave it licensing authority over three defined categories of nuclear materials: "special nuclear material," "source material," and "byproduct material." Id. Secs. 51-82, 68 Stat. at 929-35 (codified at 42 U.S.C. Secs. 2071-2112). Persons seeking to possess, use, or transfer these materials were required to have a license from the AEC. Id. Secs. 53, 57, 62-63, 81, 68 Stat. at 930-33, 935 (codified as amended at 42 U.S.C. Secs. 2073, 2077, 2092-93, 2111). Through its licensing authority, the AEC was empowered to establish standards for the safe use of these materials. Id. Sec. 161, 68 Stat. at 948-51 (codified at 42 U.S.C. Sec. 2201(b)).
 
 
 4
 "Special nuclear material" consists of fissionable material, such as reactor fuel. See S.Rep. No. 1699, 83d Cong., 2d Sess. 8-9 (1954), U.S.Code Cong. & Admin.News 1954, 3456; see also 42 U.S.C. Sec. 2014(aa) (statutory definition). "Source material" is the raw material, such as uranium or thorium, from which special nuclear material is produced, or ores containing source materials "in such concentration as the Commission may by regulation determine." 42 U.S.C. Sec. 2014(z) (1982); see also W. Fox, Federal Regulation of Energy, Sec. 22.02 (1983) (explaining the nuclear fuel cycle). "Byproduct material," as originally defined, was material made radioactive through exposure to special nuclear material. AEA Sec. 11(e), 68 Stat. at 923 (current version codified at 42 U.S.C. Sec. 2014(e)(1)). It is important to note that all three types of material were considered useful. The AEA made no provision for regulating waste materials generated during the extraction or concentration of source material.
 
 
 5
 By the 1960's and early 1970's, federal and state authorities began to realize that wastes, or "mill tailings," resulting from the extraction or concentration of source material posed a significant public health problem. H.R.Rep. No. 1480, 95th Cong., 2d Sess., pt. 2, 28 (1978) ("House Report"), U.S.Code Cong. & Admin.News 1978, 7433, 7455. As early as 1960, however, the AEC had concluded that because these mill tailings generally could not be classified as source material (their source material content being below the 0.05% by weight stipulated by NRC regulation, 10 C.F.R. Sec. 40.4(h) (1989)), they lay outside the AEC's statutory licensing authority and therefore beyond its regulatory reach. See AEC General Counsel Memoranda dated Dec. 7, 1960 & Apr. 15, 1960, reprinted in Uranium Mill Tailings Control Act of 1978: Hearings on H.R. 11698, H.R. 12229, H.R. 12938, H.R. 12535, H.R. 13049 and H.R. 13650 Before the Subcomm. on Energy and Power of the House Comm. on Interstate and Foreign Commerce, 95th Cong., 2d Sess. 204-07 (1978) ("Hearings ").
 
 
 6
 After congressionally directed studies of the mill tailings problem were completed, Congress began to consider remedial legislation. The House Report described the need for such legislation in the following terms:
 
 
 7
 Uranium mills are a part of the nuclear fuel cycle. They extract uranium from ore for eventual use in nuclear weapons and power plants, leaving radioactive sand-like waste--commonly called uranium mill tailings--in generally unattended piles. As a result of many years of uranium ore processing, about 140 million tons have now accumulated at active and inactive milling sites, according to the Nuclear Regulatory Commission.
 
 
 8
 NRC Chairman, Dr. Joseph M. Hendrie, describes how these piles are a hazard to the public health:
 
 
 9
 "The NRC believes that long-term release from tailings piles may pose a radiation health hazard if the piles are not effectively stabilized to minimize radon releases and prevent unauthorized use of the tailings."
 
 
 10
 House Report at 25. The legislation submitted with the House Report, the UMTRCA, was designed to address this potential health hazard by augmenting the existing regulatory regime to bring mill tailings within the NRC's explicit authority and to establish a comprehensive program to provide for their safe disposal. See id. at 28-30.
 
 
 11
 The purpose of the UMTRCA was two-fold: first, to close the gap in NRC regulatory jurisdiction over the nuclear fuel cycle by subjecting uranium and thorium mill tailings to the NRC's licensing authority; and second, to provide a comprehensive regulatory regime for the safe disposal and stabilization of the tailings. Title I of the UMTRCA provided a specific remedial program for twenty designated inactive uranium milling sites. UMTRCA Secs. 101-115, 92 Stat. at 3022-33 (codified as amended at 42 U.S.C. Secs. 7911-7925). Title II established a comprehensive remedial program for mill tailings at all other sites. Id. Secs. 201-209, 92 Stat. at 3033-41 (codified in scattered sections of 42 U.S.C. ch. 23).
 
 
 12
 Title II brought mill tailings within the NRC's licensing authority by adding a new category to the AEA's definition of byproduct material, namely,
 
 
 13
 the tailings or wastes produced by the extraction or concentration of uranium or thorium from any ore processed primarily for its source material content.
 
 
 14
 Id. Sec. 201, 92 Stat. at 3033 (codified at 42 U.S.C. Sec. 2014(e)(2)) ("section 11(e)(2)"). The remedial provisions of Title II are keyed to this new category of licensable byproduct material; thus section 11(e)(2) serves as the trigger for determining what materials are to be subject to the remedial program established by Title II.
 
 
 15
 Under the provisions of Title II, the NRC, in conjunction with the Environmental Protection Agency ("EPA"), is required to establish standards for the decontamination, decommissioning, and reclamation of milling sites and the stabilization and disposal of mill tailings. Id. Secs. 203, 205(a), 206, 92 Stat. at 3036, 3039-41 (codified at 42 U.S.C. Secs. 2022, 2114, 2201). The NRC must also ensure that the tailings are properly handled according to those standards. Id. Secs. 202, 205, 92 Stat. at 3033-36, 3039 (codified at 42 U.S.C. Secs. 2111, 2113-14). Pursuant to this mandate, the NRC and the EPA have established comprehensive criteria for the management, stabilization, and disposal of mill tailings. See 10 C.F.R. part 40 Appendix A (1989); 40 C.F.R. Secs. 61.250-.252, 192.30-.43 (1989).
 
 
 16
 Finally, section 274 of the AEA, 42 U.S.C. Sec. 2021, provides for the sharing of some of the NRC's regulatory responsibilities with the states. If a state desires to assume regulatory responsibilities for certain types of radioactive materials within its boundaries, and the Commission finds, after opportunity for notice and comment, that the state's regulatory program meets certain statutory requirements and is otherwise compatible with the Commission's regulatory program, the Commission must enter into an agreement transferring regulatory authority over those types of materials to the state. 42 U.S.C. Sec. 2021 (1982). The petitions now before us arise from such an agreement.
 
 B. Factual Background
 
 17
 In 1967, Kerr-McGee acquired a mill in West Chicago, Illinois. This mill, established in 1931, was used to extract thorium and rare earths from monazite ore until it was closed in 1973. Thorium was originally extracted for use in the production of mantles for gas lamps, but beginning in the 1940's, the federal government purchased large quantities of thorium for use in its national defense program. Most of the tailings resulting from the milling process remained at the facility (the "onsite material"). During the first two decades of the plant's operation, it appears that significant quantities were removed for use as landfill. Thus wastes produced at the plant found their way to certain residential areas, a nearby creek, a local park, and a sewage treatment plant (the "offsite material").
 
 
 18
 In May 1987, the Commission and the State of Illinois entered into an agreement ("Agreement") pursuant to section 274 of the AEA which provided that Illinois would obtain jurisdiction over source material within the state, while the Commission would retain jurisdiction over byproduct material as of June 1, 1987. The Agreement did not specify which materials in Illinois were to be characterized as source or byproduct. When it was published for comment, however, the NRC staff expressed the opinion that the onsite material at Kerr-McGee's facility was byproduct material and therefore would remain within the NRC's jurisdiction, while the offsite material was source material and therefore would fall under the state's jurisdiction. Staff Assessment of Proposed Agreement Between the NRC and the State of Illinois, 52 Fed.Reg. 2309-11, 2322 (1987). Kerr-McGee objected to the NRC staff's characterization of the offsite wastes as source material and urged the Commission to consider this objection before approving the Agreement. On May 13, 1987, the Commission approved the Agreement without responding to Kerr-McGee's objection. Notice of Agreement With State of Illinois, 52 Fed.Reg. 22,894 (1987). Kerr-McGee's petition for review of the Commission's approval is before us in No. 87-1254.
 
 
 19
 In the meantime, on May 28, 1987, after the Agreement had been signed but just before it had gone into effect, the NRC staff moved before an administrative appeal board to dismiss another proceeding concerning offsite material found in nearby Kress Creek on the grounds that it was source material and, as such, would no longer be within the jurisdiction of the NRC. Kerr-McGee opposed this motion, and on June 23, 1987, the appeal board denied the staff's motion on the ground that the tailings in Kress Creek were byproduct material still within the NRC's jurisdiction. The staff petitioned the Commission for review of this ruling on July 13, 1987.
 
 
 20
 On September 11, 1987, the Commission announced that it would hold the staff's petition for review in abeyance because the dispute with Kerr-McGee concerned the proper classification of all of the offsite materials from the West Chicago facility, thus causing substantial uncertainty over the proper division of regulatory responsibility between Illinois and the NRC. In re State of Illinois, NRC No. MISC-87-1, Order at 2 (Sept. 11, 1987). To resolve this uncertainty, the Commission decided to conduct a further proceeding to determine as a factual matter whether the materials at and around Kerr-McGee's facility (including those at Kress Creek) should be classified as source material or byproduct material. Id. at 2-3.
 
 
 21
 On August 5, 1988, the Commission rendered its decision, holding that the onsite material and the tailings at Kress Creek and one other location were byproduct material and therefore within its jurisdiction, while the others were source material within Illinois' jurisdiction. In re State of Illinois, 28 N.R.C. 75 (1988). The Commission so held because of its conclusion that while the definition of source material was based on its content, the definition of byproduct material, which contains the phrase "processed primarily for its source material content," required a determination of the purpose for which the ore was first processed. Id. at 80. The NRC acknowledged that as a consequence of its reading of the statute, "two waste piles may be identical in content and thus pose the same health hazard and yet one pile may be 'Sec. 11(e)(2) byproduct material' because of its history." Id.
 
 
 22
 The Commission based its determination on an analysis of the sales and production history of the facility. It found that the tailings produced during the period from 1936-1953 resulted from ore that in the first instance had been processed for its rare earth rather than its thorium (source material) content, while the reverse was true for most of the period after 1953. Because the offsite wastes were produced during the former period, the Commission concluded that they were source material. The Commission stated that
 
 
 23
 [t]he sales and production figures for that period [before 1954] show that processing was driven by the demand for rare earths: During the period 1936-1953, processing at the facility aimed to extract all the rare earths and thorium from 30,000 tons of ore, and all that was extracted was sold. However, of that 30,000 tons, only 13,986 were initially processed for thorium sales. The other 16,104 tons were initially processed only for their rare earths content, and the byproduct of that processing, still with its full complement of thorium, was stockpiled. Only later was that stockpiled byproduct re processed for its thorium, for sales to the AEC. Thus, although all 30,000 tons eventually were processed for their thorium, the demand for rare earths was apparently sufficient to cause all 30,000 tons to be processed. Conversely, the demand for thorium was not necessary to cause all 30,000 tons to be processed, and thus was not a primary purpose for the processing.... Thus the ore processed before 1954 was processed primarily for its rare earths content, and the wastes from that processing are not Sec. 11(e)(2) byproduct material.
 
 
 24
 Id. at 87 (citations and footnote omitted, emphasis in original).
 
 
 25
 Thus, even though all of the tailings had been derived from ores processed for their rare earth as well as thorium content and were identical both in their physical composition and in the health hazards they posed, the Commission held that one group of tailings--the offsite wastes--were source material, while the other group--the onsite wastes--were byproduct material. Id. at 75, 80-87. This was the necessary consequence of a construction of section 11(e)(2) that effectively held that unless the first, chief, or principal purpose for processing a particular batch of ore is to obtain source material, the resulting tailings are not byproduct material. Kerr-McGee and Illinois petition for review of this decision in Nos. 88-1636 and 88-1726.
 
 II. DISCUSSION
 
 26
 In their petitions for review, Kerr-McGee and Illinois take issue with the Commission's interpretation of section 11(e)(2) of the AEA. They also contend that the Commission wrongly relied on a Kerr-McGee internal memorandum that was not properly part of the record and that they were denied the opportunity to confront the memorandum. Kerr-McGee raises two additional arguments: that transfer of regulatory jurisdiction to a state agency that has prejudged the issues and is a party to proceedings before the Commission violates Kerr-McGee's due process rights, and that the Commission failed to follow its own procedural rules. Illinois, an intervenor in both of Kerr-McGee's petitions, sides with the NRC on the first argument but takes no position with respect to the second.
 
 
 27
 As we find that the Commission's interpretation of section 11(e)(2) of the AEA is an impermissible one, we grant the petitions for review of the Commission's August 5, 1988 decision. Because the Commission's impermissible interpretation does not affect the Agreement transferring regulatory jurisdiction over source material to Illinois and because we reject Kerr-McGee's other arguments, we deny Kerr-McGee's petition for review of the Commission's approval of the Agreement.
 
 
 28
 When reviewing an agency's interpretation of an ambiguous provision in its organic act, a court will defer to the agency's construction if it is reasonable. Chevron U.S.A. Inc. v. Natural Resources Defense Council, 467 U.S. 837, 843 & n. 11, 845, 104 S.Ct. 2778, 2782 & n. 11, 2783, 81 L.Ed.2d 694 (1984). The court, however, must reject the agency's interpretation if it is " 'inconsistent with the statutory mandate or [would] frustrate the policy that Congress sought to implement.' " Securities Indus. Ass'n v. Board of Governors, 468 U.S. 137, 143, 104 S.Ct. 2979, 2982, 82 L.Ed.2d 107 (1984) (quoting FEC v. Democratic Senatorial Campaign Committee, 454 U.S. 27, 32, 102 S.Ct. 38, 42, 70 L.Ed.2d 23 (1981)).
 
 
 29
 Throughout the AEA, different classes of materials are dealt with in accordance with their physical properties and place within the nuclear fuel cycle. The UMTRCA is no different. In section 11(e)(2), as originally presented in the UMTRCA, byproduct material was defined as "the tailings or wastes produced by the extraction or concentration of uranium or thorium from source material." H.R. 13382, 95th Cong., 2d Sess. Sec. 1 (1978) (emphasis added). Because of his concern that tailings resulting from the processing of low-grade feedstock ore containing less than the 0.05% uranium necessary to constitute source material under NRC rules would escape regulation under the proposed definition, then-NRC Chairman Dr. Hendrie suggested that the definition of byproduct materials proposed in section 11(e)(2) be revised to substitute "any ore processed primarily for its source material content" (the language now appearing in the section) for the words "source material." Hearings at 343. When questioned as to the significance of the phrase "processed primarily for its source material content," Dr. Hendrie explained that the language was intended to avoid bringing within NRC jurisdiction radioactive wastes resulting from activities not connected with the nuclear fuel cycle, which would be left to EPA regulation. The following exchange between Dr. Hendrie and Subcommittee Chairman Dingell is instructive:
 
 
 30
 MR. HENDRIE. Mr. Chairman, the intent of the language is to keep NRC's regulatory authority primarily in the field of the nuclear fuel cycle. Not to extend this out into such things as phosphate mining and perhaps even limestone mining which are operations that do disturb the radium-bearing crust of the Earth and produce some exposures but those other activities are not connected with the nuclear fuel cycle, EPA is looking at those and those appear to me to be things that ought to be left to EPA regulation under the Resource Conservation Recovery Act and general authorities.
 
 
 31
 MR. DINGELL. Your thesis is that we ought not however set up a set of circumstances where we would leave some of these to fall between the cracks and wind up being unregulated.
 
 
 32
 MR. HENDRIE. I agree fully, Mr. Chairman, and I believe the way the language would cut here, as we recommended, would not leave any crevasse between the two authorities.
 
 
 33
 Id. at 344. It is clear from this exchange that the definition of "byproduct material" proposed by Dr. Hendrie and adopted by Congress was designed to extend the NRC's regulatory authority over all wastes resulting from the extraction or concentration of source materials in the course of the nuclear fuel cycle.
 
 
 34
 And yet, in applying its interpretation of section 11(e)(2), the NRC makes its determination of what waste materials will be subject to the Title II remedial regime not on the basis of their physical characteristics or relationship to the nuclear fuel cycle, but solely on the objective for which the feedstock ore is first processed. As a consequence, the NRC's interpretation recreates the regulatory gap that the UMTRCA was designed to eliminate and excludes from regulation for the protection of the public health some of the radioactive tailings that Congress intended to bring within the agency's authority.
 
 
 35
 The NRC achieves this anomalous result by attaching the narrowest possible meaning to the phrase "ore processed primarily for its source material content." 42 U.S.C. Sec. 2014(e)(2). The NRC construes the word "primarily" to mean that the extraction of thorium or uranium must be the first, chief, or principal reason for processing the ore brought to a mill in order for the resulting tailings to be characterized as "byproduct material." By implication, the NRC also defines "ore" as material from which nothing of value has yet been extracted.
 
 
 36
 Thus, in the case before us, the NRC determined that because more than half of the feedstock ore processed during the period in which the offsite material was generated was first processed for its rare earth content with the remaining material stockpiled and only later processed for thorium, the offsite wastes were not section 11(e)(2) byproduct material. State of Illinois, 28 N.R.C. at 87. Consequently, the NRC arrived at the bizarre conclusion that only one of the two piles of tailings could be classified as byproduct material--and therefore made subject to those regulations designed to protect the public health from hazards posed by it--even though both piles had been derived from the same series of chemical processes applied to the same feedstock ore and, as a consequence, were chemically indistinguishable.
 
 
 37
 This is not a situation where inconsistent results are mandated by the language Congress has written into law. Here the language is clearly ambiguous, or we would not be concerned with the deference due the agency's interpretation under the Chevron analysis. But Chevron does not require deference to an interpretation that would "frustrate the policy that Congress sought to implement." Securities Indus. Ass'n, 468 U.S. at 143, 104 S.Ct. at 2982. Here, the NRC could easily have placed an alternative construction on the key phrase, "ore processed primarily for its source material content," that would not have scuttled critical congressional objectives.
 
 
 38
 As the Supreme Court has pointed out, the word "primarily" is capable of a range of meanings extending from "first" or "chief" to "substantially." See Board of Governors v. Agnew, 329 U.S. 441, 446-47, 67 S.Ct. 411, 414, 91 L.Ed. 408 (1947) (interpreting the term "primarily engaged" in section 32 of the Banking Act of 1933, 12 U.S.C. Sec. 78). Had the agency adopted the latter meaning, it could easily have found that the offsite tailings had been derived from ore that had been "substantially" processed for its thorium content.
 
 
 39
 The word "ore" is also subject to more than one meaning. In fact, there is ample basis within the AEA for applying the term to the stockpiled material remaining after the rare earth had been extracted from the feedstock ore and before that material had been processed for its thorium content. For example, section 101 of the UMTRCA states that "[a] license for the production of any uranium product from residual radioactive materials shall not be treated as a license for production from ores ... if such production is in accordance with section 7918(b) of this title." 42 U.S.C. Sec. 7911(6) (1982) (emphasis added). The clear implication is that if such production is not in accordance with section 7918(b), then production from residual radioactive materials may be treated as production from ores.
 
 
 40
 Moreover, the NRC's designation of the offsite tailings as "source material" implies that they may be properly categorized as "ore" because the NRC defines source material as "ores which contain by weight ... (0.05%) or more of ... thorium." 10 C.F.R. Sec. 40.4(h) (emphasis added); see also 42 U.S.C. Sec. 2014(z) (statutory definition of source material). The NRC cannot have it both ways. If the offsite tailings may be characterized as ore, so must the stockpiled material from which they were derived.
 
 
 41
 The NRC's construction is not saved by the happenstance that the tailings in this case have a sufficiently high thorium content (0.05% or more by weight) to enable the agency to classify the offsite wastes as "source material" and therefore subject to its licensing authority under another part of the AEA. In the first place, statutory definitions are intended to have general applicability. A construction of section 11(e)(2) is not acceptable if it will orphan mill tailings having a source material content of less than the 0.05% threshold, as is usually the case. Second, the NRC's interpretation would exclude the offsite wastes from coverage by the regulations promulgated pursuant to Title II that are designed to protect the public health against the hazards created by mill tailings produced in the course of the nuclear fuel cycle.
 
 III. CONCLUSION
 
 42
 The UMTRCA was intended to bring previously unregulated radioactive end products of the source material extraction process within the scope of NRC regulation and to provide a comprehensive remedial program for the safe stabilization and disposal of uranium and thorium mill tailings. The NRC's interpretation of section 11(e)(2), however, places a portion of the thorium tailings from Kerr-McGee's West Chicago facility outside of the UMTRCA's regulatory regime even though they are in all relevant ways identical to tailings found by the NRC to be byproduct material and thus subject to the UMTRCA's remedial program. The NRC's construction thus frustrates the purposes of the UMTRCA by rendering it inapplicable to waste material that it was clearly intended to reach and recreating a jurisdictional gap it was intended to close. As we find that interpretation impermissible, and as we have considered the other arguments put forth by Illinois and Kerr-McGee and found them without merit, we grant the petitions for review in Nos. 88-1636 and 88-1726, and deny the petition for review in No. 87-1254.
 
 
 43
 So ordered.