EDDIE BELMONTE, Plaintiff and Appellant, *v.* AGUSTÍN MERCADO REVERÓN, ETC., Defendants and Appellees.

No. R-64-179.      Decided July 14, 1967.

*Cayetano Coll Pujols* and *Enrique González* for appellant. *Germán Rieckehoff Sampayo* for appellees.

MR. JUSTICE BLANCO LUGO delivered the opinion of the Court.

On July 6, 1964, petitioner, Eddie Belmonte, brought an action before the Superior Court, San Juan Part, which he labelled "civil action", including as sole defendants Agustín Mercado Reverón, in his capacity as Racing Administrator, and the three members which make up the jury of the horse races held at the El Comandante Race Track. After narrating in twenty-seven paragraphs a series of facts which culminated in the imposition by the Administrator of a penalty of 10 days of suspension as jockey,[1] petitioner con-

---

[1] It is set forth that petitioner Belmonte was obstructed by another jockey in one of the races held on May 10, 1964, for which reason a claim of foul was filed before the members of the jury, who disregarded it and declared the finish "official"; that the petitioner called the jury again in order to set forth his objection to the decision and to the inaction before his claim, the chairman of the jury answering that "who was he to question the decisions of the jury"; that upon going toward the jockeys' room he had a wrangle with the jockey who had obstructed him and as a result thereof he was punished with a three-day suspension; that when the races had terminated, while he was getting ready to go home, he was approached by a newspaperman to whom he informed about his purpose of going to New York since it was impossible for him to work in Puerto Rico; that the newspaperman warned him to change his attitude reminding him that he was the leader in winning mounting, asking him "what are you going to do to your leadership," to which he answered

cludes praying that "in protection of the constitutional rights of this claimant the Court is requested to pass upon the following points:

"(1) that plaintiff is entitled to legal assistance in any appearance to answer for charges before the Racing Jury, Racing Administrator or any other Racing Authority.

"(2) that subsections 20 and 21 of § 1001 of the Racing Regulations insofar as they deprive the plaintiff of the constitutional right to freedom of speech, subject to the provisions of the Penal Code of Puerto Rico, are void and unconstitutional.

"(3) that neither the Racing Jury, nor the Racing Administrator, nor any other racing authority is empowered to punish plaintiff without having complied with the minimum requirements of due process of law; and

"(4) that it be specifically decreed that the suspension of 10 days imposed on plaintiff by the Racing Administrator in his Resolution of May 21, 1964, is null and void at law and the same should be eliminated from the record of this plaintiff in the Racing Administration and likewise that if said punishment has been notified to any foreign agency, instrumentality, or authority connected with the racing sport with which the Racing Sport Administration of Puerto Rico has connections they be notified of the elimination of said punishment."

■■ We note, at the threshold, that there is nothing in the Racing Act of Puerto Rico, Act No. 149 of July 22, 1960, 15 L.P.R.A. § 181 *et seq.*, authorizing the direct re-

that "he gave the leadership as a present to the members of the jury so they could do what they wanted with it"; that on May 13 he went to New York, and the following 16th he received a cable informing him that he had been indefinitely suspended and his presence before the jury was required; that he returned the 17th accompanied by his attorney, he requested a hearing, which was denied; that the 19th he was summoned to appear at a hearing before the Racing Administrator, which was held next day; that at said hearing no evidence was heard on the alleged charges; that he was served with notice of an order of the Administrator imposing a penalty of 10 days counted from the 13th of May, so that it expired the same day he was notified; that he appealed to the Racing Board alleging "that his constitutional rights had been violated" and on June 3 the Board served notice on him of a resolution declaring itself without jurisdiction.

view by the courts of the actions of the Administrator, and much less of the members of the jury. Section 9, 15 L.P.R.A. § 189, provides the review, by way of certiorari, of the decisions, orders, or final resolutions of the Racing Board as to errors of law. But, as we have seen, the Racing Board is not a part of this proceeding. Now then, even though we would interpret with excessive liberality that paragraph 23 of the complaint[2] seeks to challenge an action of this entity, the trial court could not take cognizance of the matter since the reconsideration of the resolution was not timely requested nor the petition for certiorari filed within the term specified by law.[3] In our opinion the foregoing is sufficient to show that the applicable administrative remedy was not properly exhausted.

■ On the other hand, it should be explained that this is a case of the temporary suspension of petitioner's jockey license for the limited period of 10 days.[4] We are not considering a cancellation or revocation of a license blindly requiring a previous hearing and the opportunity of defense. Already in *Las Monjas Racing Corp.* v. *Racing Commission,*

---

[2] "That on June 3, 1964, the Racing Board served notice on this plaintiff of a resolution declaring itself without jurisdiction to take cognizance of the appeal."

[3] Section 9 provides in part that "Provided, That prior to the filing of the certiorari petition, the interested party shall motion the Racing Board to reconsider such decision, order, or resolution." This is not a mere formality if it is borne in mind that before the Superior Court the petitioner may plead as errors of law in his petition for review only those pleaded in his motion for reconsideration to the Racing Board.

It provides also that "The certiorari petition . . . must be filed within the period of fifteen (15) days following the service of notice . . . of the pertinent decision, order, or final resolution."

[4] The decision of the jury of May 17, 1964, provided that the jockey "continue suspended", but when the matter was referred to the Administrator "so that, after the corresponding investigation, he may take the measures he deems necessary", said officer, on May 21, limited the suspension to 10 days, which expired on the following May 23.

67 P.R.R. 42 (1947), construing a similar statute,[5] we said at pages 46 and 47:

"[1, 2] Since a license is a privilege and it does not constitute property nor is it a contract between the person licensed and the Government, its revocation does not take away any right under the Constitution. *People* v. *Department of Health*, 82 N.E. 187 (N.Y. 1907). Consequently when the Legislature grants a license it may impose the terms which it deems reasonable for its temporary suspension or revocation. Indeed, the Racing Act of Puerto Rico upon conferring authority on the Racing Commission to grant licenses also granted to it the power to suspend them temporarily, cancel or take them away. As to the temporary suspension, it empowered the Commission to decree it without the need of a previous hearing and did not grant the right of review in the courts. However, the power to cancel or take away the licenses was subject to the condition of giving the party an opportunity to be heard and granted him the right to judicial review.

"[3] .        .        .        .        .        .        .        .

"The temporary suspension, as distinguished from the cancellation—which has the character of permanency—ought to be for a definite period, which should appear from the face of the order decreeing the suspension."

When dealing with punishments imposed by the jury, it is easy to note that it would be practically impossible to administer the law if it were required that the proceedings before said body, which are generally related to the conduct observed in the course of the races, must unfailingly follow the formalities of hearings, legal assistance, cross-examination of witnesses, etc.

The lawmaker expressly provided that the Administrator was empowered to suspend temporarily or to cancel permanently jockey licenses (§ 7, 15 L.P.R.A. § 187), and that in the case of a permanent cancellation only he shall grant the prejudiced party the opportunity to be heard in its

---

[5] Section 7 of the former Racing Act, as amended by Act No. 17 of July 15, 1935. (Sp. Sess. Laws, pp. 92, 96.)

defense by itself or by counsel. In the instant case we note that the Administrator cautiously granted a hearing to the jockey Belmonte.[6]

■ But there is more. From the confused recital of the allegations it transpires that it seeks to impress us that this case involves petitioner's freedom of speech, since originally it was certain statements made by the latter which gave rise to his summons by the jury. This is not so. The decision of the jury referring the case to the Administrator says: "Considering that the jockey E. Belmonte despite having been summoned by the Jury to appear before said body for the purpose of investigating certain statements made by said jockey to the press, radio, and television, *has not appeared*; and considering further that the alleged statements, if it is true that they were made by said jockey, constitute in the jury's opinion, a violation of subsections 20 and 21 of § 1001 of the Racing Regulations . . . ;" and in the resolution of the Administrator it is clearly set forth that "The action of the racing jury suspending jockey Belmonte was due to the fact that it summoned Belmonte to appear before said body for the purpose of investigating alleged statements made by said jockey, which the jury believed that if true, they constituted a violation of the racing regulations, and said jockey did not appear before the jury as it was his duty to do." That is why said officer, in deciding the case states that "More than the statements we have been discussing, what really concerns us is Belmonte's challenge in not appearing before the jury when he was summoned to do so. We believe that there was no justification for such act of open lack of discipline."[7] This suffices to dissipate

---

[6] The resolution of the Administrator says in part: "On that day and hour the defendant appeared accompanied by Mr. Cayetano Coll Pujals."

[7] Now it is sought to adduce *untimely* that petitioner did not comply with the jury's summons because he was precluded from bringing his

any concern that the violation of a constitutional right is involved.[8]

■ But be that as it may, another obstacle appears before petitioner's claims. Section 8, 15 L.P.R.A. § 188, provides that appeals may be taken before the Racing Board from the suspensions imposed by the Administrator or the jury only when the suspension is for a term of one month or more. In this respect the Racing Board acted correctly in declaring itself without jurisdiction.[9]

■ Finally we want to call the attention to the fact that upon filing the petition for review before this Court, petitioner attached copies of several documents—the agreement of the jury of May 19 incorporated to the summons for hearing issued by the Administrator, the resolution of the Administrator, the notice of appeal before the Racing Board and the latter's resolution—which the trial court did not have before it. This practice is undesirable and should be discontinued. The trial court is placed at a marked disadvantage.

For all the reasons stated, the judgment rendered by the Superior Court, San Juan Part on July 31, 1964, granting the motion to dismiss filed by defendants will be affirmed.

Mr. Chief Justice dissented in a separate opinion. Mr. Justice Belaval dissented in an opinion in which Mr. Justice Hernández Matos and Mr. Justice Santana Becerra concur.

---

attorney. It seems to appear that this explanation was not presented before the Administrator, the jockey's attorney merely explaining "the scope of the statements made."

[8] We are the first to admit that the phrases attributed to petitioner are not in any way detrimental to the racing sport and that they were rather the expression of petitioner's spontaneous reaction before actions of the jury from which he dissented.

[9] We are aware that successive suspensions for terms less than one month could produce the indefinite suspension of a jockey. Since we are not confronting this situation, we refrain from expressing our view on that point. See, however, *Hernández v. Insular Racing Commission*, 50 P.R.R. 96 (1936).

—O—

MR. CHIEF JUSTICE NEGRÓN FERNÁNDEZ, dissenting.

San Juan, Puerto Rico, July 14, 1967

I wish to briefly state the grounds for my dissent.

The complaint of the jockey Eddie Belmonte in this case —whose allegations of fact should be taken as true for the purposes of defendants' motion to dismiss—was dismissed by a decision entitled *Judgment* which reads thus:

"After examining the complaint in the manner most favorable to plaintiff, and in view of the provisions of § 9 of the Racing Act of Puerto Rico, Act No. 149 of July 22, 1960, the motion to dismiss is granted since the plaintiff has not exhausted the administrative remedy. Moreover, the plaintiff not having appealed to this Court by way of certiorari as provided by said § 9, the adjudication made by the racing jury or the Racing Administrator in his case, constitutes res judicata."

However, the stenographic transcript containing the argument of the parties on the motion to dismiss, shows that the trial court, in open court, granted said motion stating the following: "The court grants the motion to dismiss on any of the first two grounds set forth therein."

The first two grounds adduced in the aforesaid motion to dismiss were the following:

"1. The complaint does not set forth a claim which justifies the granting of a remedy." and
"2. The punishment imposed on plaintiff having been complied with the claim is academic."

A third ground, to which the court did not refer in granting the motion to dismiss in open court was: "The plaintiff has not exhausted the administrative remedy."

I consider erroneous the order or judgment of the trial court granting the motion to dismiss on any of the foregoing grounds, in open court as well as in its order or judgment above-copied. Likewise I consider erroneous the holding of this Court to the effect that "the applicable administrative

remedy was not properly exhausted" referring to the fact that Belmonte did not request timely the reconsideration of the Racing Board declaring itself without jurisdiction to take cognizance of an appeal brought by Belmonte from the suspension of 10 days imposed on him by the Racing Administrator; and that he did not appeal to the Superior Court by way of certiorari from the decision of the Racing Board within the term of 15 days after service of notice of the aforesaid decision.

Belmonte was not entitled to appeal before the Racing Board from the suspension of 10 days imposed on him by the Racing Administrator, since such appeal is authorized by the Racing Act, § 8 (15 L.P.R.A. § 188), only when the suspension is for a term of one month or more. The Court itself in its opinion accepts that the Racing Board acted correctly in declaring itself without jurisdiction for that reason. Therefore Belmonte was not entitled to the administrative remedy of appeal before the Racing Board, nor did he have to exhaust the requirement of the administrative proceeding of filing any motion for reconsideration, nor was he entitled to the remedy of certiorari provided by § 9 of the Act, 15 L.P.R.A. § 189, to review a final resolution of the Racing Board as to errors of law. His punishment not being one of a suspension of 30 days or more, the Racing Board was not empowered or did not have jurisdiction to grant him any remedy, and consequently, Belmonte did not have to exhaust any administrative remedy in search of a remedy which was not available to him. Therefore the ground that Belmonte did not exhaust the administrative remedy of reconsideration of the decision of the Racing Board, or that he failed to file the petition for certiorari before the Superior Court within the term specified by law, are not grounds valid at law for dismissing his complaint.

Nor is the ground valid that Belmonte's judicial action was academic because the punishment imposed had been

complied with. From the facts alleged in the complaint it appears that notice of the decision of the Racing Administrator imposing on him a punishment of 10 days beginning on May 13, 1964, was served on him the same day on which the punishment expired. I do not see how that ground could be invoked against Belmonte, when the alleged compliance thereof does not arise from a voluntary act of the person punished, but it arises as a consequence of the proper action of the Racing Administrator fixing the extension of the punishment until the very day on which it expired from the time it was made effective on May 13.[1] Belmonte did not have the statutory remedy of review against the decision of the Racing Board nor against the action of the Administrator imposing on him a suspension of 10 days. Therefore, not by way of statutory review, but because he challenged actions which he considered arbitrary, it was appropriate for the trial court to entertain the judicial action brought by Belmonte, for, irrespective of the power vested on the jury or Racing Administrator to impose suspensions of less than one month without statutory review, the fundamental question which appears from the allegations of his complaint centers on whether the phrases attributed to Belmonte with respect to the jury, at the races of May 10, constituted a violation of subsections 20 and 21 of § 1001 of the Racing Regulations, that is, "to act toward or address in a vulgar

---

[1] According to the facts alleged in the complaint it was during the races held on May 10 of that year that the original incident occurred (see footnote 1 of the opinion of the Court), on which date Belmonte filed a claim of foul before the members of the jury who dismissed it and declared the finish official, thereafter upon going to the jockeys' room, Belmonte had a wrangle with the jockey who, according to him, had obstructed him, as a consequence of which a suspension of 3 days was imposed on Belmonte.

I must assume that Belmonte complied with the punishment of 3 days of suspension imposed on him on account of the aforesaid wrangle, and that therefore the subsequent suspension of 10 days was imposed on him by the Racing Administrator as of May 13, that is, after the first suspension of 3 days had been complied with.

or coarse way or to be disrespectful to any official or employee of the Administration," subsection 20, and "to make statements which are false and detrimental to the horse racing sport and the making of such statements about persons connected with the same," subsection 21; or whether the statements attributed to Belmonte did not constitute such violation, which is admitted by this Court in its opinion, footnote 8, in stating "we are the first to admit that the phrases attributed to petitioner are not in any way detrimental to the racing sport and that they were rather the expression of petitioner's spontaneous reaction before actions of the jury from which he dissented."

It is easy to note that if the statements attributed to Belmonte did not constitute a violation of subsections 20 and 21 afore-cited, the same could not give rise to a punishment, and under such conditions, it being possible that Belmonte's right of freedom of speech might be involved in the investigation which the jury was to make of such statements (on a subsequent date to the 10th on which the races were held), it was not unusual for Belmonte to request a hearing before the jury on the 17th accompanied by counsel (which was denied), for apart from the importance of Belmonte's right which might be injured, it was not a question of an investigation by the jury at the same time that the races were being held, which because of its nature and for practical reasons should be brief, but of an investigation not directly related to the development of the races in itself and which would not interrupt the development thereof.

The risk that the doors of courts be closed to the examination of the actions of administrative officers, which have their source in concepts of the right of speech which might be erroneous, is not saved by the fact that Belmonte was punished for his *failure to appear* before the jury in the investigation which the latter intended to carry out of the statements he had made and not of the statements themselves. It should be examined, in my opinion, whether under

the circumstances of this case Belmonte's failure to appear before the jury was unjustified and whether the punishment imposed on him by the Racing Administrator was in effect for an act of "open lack of discipline," or whether a reasonable action of the jockey for the protection of his rights is involved not justifying the punishment finally imposed on him by the Administrator. That could only be determined after hearing the evidence which Belmonte offered to introduce before the trial court to support his allegations. Without prejudging a decision on the merits, I believe that Belmonte is entitled to his day in court.

—O—

MR. JUSTICE BELAVAL, with whom MR. JUSTICE HERNÁNDEZ MATOS and MR. JUSTICE SANTANA BECERRA agree, and with whom MR. CHIEF JUSTICE LUIS NEGRÓN FERNÁNDEZ concurs, dissenting.

San Juan, Puerto Rico, July 14, 1967

The petition for review filed by plaintiff-petitioner alleges the following facts, admitted as true for the purposes of the discussion by defendants-respondents:

"Petitioner is a jockey with license number J 6430 issued by the Racing Authorities of Puerto Rico and in the course of the second race of the races held on *May 10, 1964*, was obstructed by jockey R. Rivera and for that reason petitioner filed a claim of foul with the members of the Racing Jury, which claim was disregarded by them; that petitioner seeing that, while he was still in the telephone booth, the result of the race had been declared official, he again called the members of the jury in order to ask why did they not consider his claim, Mr. Francisco Arrillaga, Chairman of the Racing Jury, answering 'that who was he to question the decisions of the Jury' hanging up the telephone; bewildered and extremely annoyed by the treatment received, petitioner upon entering the jockeys' room and encountering jockey R. Rivera had a wrangle with him as a result of which he was punished by the Racing Jury to *three days of suspension*. After the races of Sunday, May 10, 1964

were terminated, while petitioner was returning home, he was interviewed by a newspaperman to whom he made certain statements, among them 'that he felt depressed, persecuted, and oppressed and he was planning to go to the city of New York to continue there working as a jockey since it was impossible for him to work here' and when the newspaperman told him to reconsider his attitude since petitioner had been the most successful jockey in the year 1963 and in 1964 was in the first place with 16 or 17 victories and what did he intend to do with the jockeys' leadership, petitioner answered 'that he gave the leadership to the members of the jury as a present so they could do what they wanted with it,' that on Wednesday, May 13, 1964, according to the decision made by petitioner after his experience of Sunday, May 10, 1964, he went to the city of New York to try to practice his profession there as jockey; that on Wednesday, May 13 and at the time of his departure to New York, petitioner had not been summoned by the Racing Jury, he had not been served with notice of any charge against him nor did he have knowledge of any charge against him, nor of any suspension imposed on him other than the suspension of three days imposed on him on Sunday, May 10, 1964 for the wrangle with the jockey R. Rivera in the jockeys' room and which suspension expired on *Wednesday, May 13, 1964*; that on Saturday, May 16, 1964 and being in the city of New York, petitioner received a call from his attorney informing him that he had been suspended indefinitely by the Racing Jury, that he must come back to appear before said jury; that in answer to his attorney's call, on Sunday, May 17, 1964 petitioner returned to Puerto Rico, and went to El Comandante Race Track accompanied by his attorney and requested to be heard by the members of the jury; that the Racing Jury refused to receive petitioner *accompanied by counsel* and petitioner did not appear before the jury on his attorney's advice; that on Sunday, May 17, 1964, that is, the same day on which petitioner, having returned from New York, sought to be received by the Racing Jury *accompanied by counsel* but the Racing Jury refused to receive him *accompanied by counsel,* said entity entered the following decision:

'*Jockey E. Belmonte—Suspended and his case referred to the Racing Administrator*. Considering that jockey, E. Bel-

monte, despite having been summoned by the jury to appear before said body in order to investigate certain statements made by him to the press, radio, and television, has not appeared; and considering further, that the alleged statements, if it is true that they were made by said jockey constitute, in the opinion of the jury, a violation of subsections 20 and 21 of § 1001 of the Racing Regulations, IT IS DECIDED THAT JOCKEY E. BELMONTE SHALL CONTINUE SUSPENDED and his case be referred to the Racing Administrator in order that, after the corresponding investigation is carried out, the Administrator shall take the measures he deems necessary in this case.' (Italics and capitals ours);

that on Tuesday, May 19, 1964, the Racing Administrator, Agustín Mercado Reverón, by means of a letter in which he copied the decision entered by the Racing Jury on May 17, 1964, summoned petitioner for an investigation to be carried out on Wednesday May 20, 1964, at nine in the morning (Letter of May 19, 1964, written by Agustín Mercado Reverón to Eddie Belmonte, Exh. 1); that in compliance with the summons made by the Racing Administrator from one day to another, that is, on May 19 to appear on May 20, petitioner appeared before said officer accompanied by his attorney; that in the Racing Administrator's Office this officer did not serve notice on petitioner of any charges for violation of the Racing Act or Regulations which might have been preferred by the Racing Jury nor did the Administrator offer any evidence of any violation by petitioner of the Racing Act and/or its Regulations; that the Racing Administrator acted in that fashion despite the fact that in his summons to petitioner for investigation he informed him that 'the alleged statements, if true, constitute in the jury's opinion, a violation of subsections 20 and 21 of § 1001 of the Racing Regulations'; that on Thursday, May 21, 1964, the Racing Administrator entered a decision imposing on petitioner a punishment of ten (10) days of suspension as of May 13, 1964 'DATE ON WHICH HE WAS SUSPENDED BY THE JURY.' (Capitals and italics ours.) (Decision of May 21, 1964 Exhibit 2); that the suspension imposed on petitioner by the Administrator by his decision of May 21, 1964, was 'as of May 13, 1964' and notice thereof was served on petitioner on May 22, 1964, that is, the same day on which the punishment expired. (See

averment No. 27 of the complaint, Exh. 5); that from. the decision of the Racing Jury of May 17,. 1964 (Exh. 1 of this petition for review) where it is stated: *'it is determined that the jockey, Eddie Belmonte, shall continue suspended'* and from the decision of the Racing Administrator of May 21, 1964, where it is stated *'the Administrator hereby imposes a suspension of ten days on jockey Eddie Belmonte as of May 13, 1964, date on which he was suspended by the jury,'* it clearly appears that petitioner was punished to indefinite suspension by the Racing Jury on May 13, 1964, without preferment of charges, or hearing, or opportunity to be heard.' (See Exhibits 1 and 2); that from the decision of May 21, 1964, petitioner appealed before the Racing Board on May 25, 1964, stating in his notice of appeal 'that despite the fact that apparently this appeal does not lie because prima facie the punishment imposed by the Administrator on defendant-appellant is of ten (10) days of suspension only, *fundamentally it does lie,* because it involves a punishment arbitrarily imposed, no fault justifying it having been committed' . . . (Petitioner's Notice of Appeal before the Racing Board of May 25, 1964, Exh. 3); that on June 2, 1964, the Racing Board entered an order at the request of the Racing Administrator, dismissing the appeal for lack of jurisdiction pursuant to the provisions of § 8 of the Racing Act in the sense that the appellate jurisdiction of the Racing Board is limited to cases of suspension of one month or more, and in cases of fines of one hundred dollars ($100). or more. (Decision of the Racing Board of June 2, 1964, Exh. 4); that in.its decision of June 2, 1964, the Racing Board stated 'appellant alleges that said provision (§ 8 of the Racing Board) is not applicable since the Administrator's decision is whimsical, arbitrary, and contrary to law and unconstitutional' and the Board continues at page 2 of its Decision 'if the appellant jockey believes that the Administrator's determination *injures his reputation,* he may resort to the legal remedies in order to protect his rights and the Board cited the case of *Hernández* v. *Insular Racing Commission,* 50 P.R.R. 96.' "

Petitioner filed a "civil action" against the Administrator and against the Racing Jury alleging that the plaintiff had a clear and unquestionable constitutional right not

to be punished without due process of law, that is, without any charge having been preferred against him, without having been summoned to a hearing, without having introduced any evidence against him on a possible violation of the Racing Act or its Regulations; that said punishment, despite the fact that it appeared to have been complied with at the time of service of notice of the decision, subsists in his record and at any time it may hinder his professional work in racing tracks in the mainland. In said civil action the following pronouncements were requested the Court: (1) that plaintiff-petitioner is entitled to legal aid in any appearance to answer for any charges before the Racing Jury, the Racing Administrator, or any other racing authority; (2) that subsections 20 and 21 of § 1001 of the Racing Regulations insofar as they deprive the plaintiff from the constitutional right to freedom of speech are void and unconstitutional; (3) that neither the Racing Jury nor the Administrator, nor any other racing authority is empowered to punish petitioner without having complied with the minimum requirements of due process of law, and (4) that the punishment imposed in this manner should be eliminated from plaintiff-petitioner's record in the files of the Racing Administration of Puerto Rico and likewise that if the punishment had been notified to any foreign agency, instrumentality, or authority, connected with the racing sport, the elimination of said punishment be likewise notified to them. The dismissal having been requested by defendants-respondents on the grounds (1) that the complaint does not set forth a claim justifying the granting of a remedy; (2) that the punishment imposed on plaintiff having been complied with, the claim is academic; (3) that plaintiff has not exhausted the administrative remedy, the San Juan Part of the Superior Court of Puerto Rico rendered the following judgment:

"After examining the complaint in the manner most favorable to plaintiff, and in view of the provisions of § 9 of the

Racing Act of Puerto Rico, Act No. 149 of July 22, 1960, the motion to dismiss is granted since the plaintiff has not exhausted the administrative remedy. Moreover, the plaintiff not having appealed to this Court by way of certiorari as provided by said § 9, the adjudication made by the racing jury or the Racing Administrator in his case, constitutes res judicata."

The sections which are alleged to be applicable to the question in issue are the following sections of Act No. 149 of July 22, 1960, creating the Racing Sport *Administration:* § 8: Any person affected by the orders, decisions, suspensions or fines imposed by the Racing Administrator, the jury and the starting judges, may appeal before the Racing Board; Provided, That in cases of penalties, fines or suspensions, appeals may be taken only when the suspension is for a term of three months or more or the fine imposed is of one hundred (100) dollars or more. The appeals shall not stay the effects of the orders, decisions, suspensions, and fines while the Board passes upon the appeal. In cases of fines the person punished may neither register nor enter a horse in a race unless he deposits in the Office of the Administrator the amount of the fine, which shall be reimbursed to him if the resolution of the Board is favorable to him. All appeals shall be filed in the office of the secretary of the Racing Board within five (5) days after notice has been served on the aggrieved person. The Board shall pass upon the case on appeal and shall hear the parties thereto within fifteen (15) days after the appeal has been filed and shall render its decision within fifteen (15) days following the hearing. The resolution of the Board may be either sustaining, modifying, or repealing the order or decision appealed from. The aggrieved party and the officials of the Administration shall be entitled to be represented by counsel. The Board shall prescribe by regulation the procedure to be followed in cases brought before it.

Section 9: The decisions, orders, or final resolutions of the Racing Board may be reviewed only as to errors of law, through writ of certiorari, by the San Juan Division of the Superior Court of the Court of First Instance of Puerto Rico; Provided, That prior to the filing of the certiorari petition, the interested party shall motion the Racing Board to reconsider such decision, order, or resolution, and the latter shall be under obligation to pass upon the merits thereof within a period of not more than ten (10) days following the filing of the request with the Board. The certiorari petition provided by this act must be filed within the period of fifteen (15) days following the service of notice on the aggrieved party of the pertinent decision, order, or final resolution; Provided, That in his petition for review the petitioner may plead as errors of law only those pleaded in his motion for reconsideration to the Racing Board. The Superior Court shall pass upon the writ of certiorari provided by this act within thirty (30) days after the petition has been definitively submitted by the parties. Neither the filing of the motion for reconsideration provided by this act nor the issuing of the writ of certiorari by the Superior Court shall stay the effectiveness of the decision, order, resolution, or action whose reconsideration is requested of the Board or which is being appealed from before the courts, save in those cases in which the punishments involved are for a period of thirty (30) days or less. No restraining orders, injunctions, or other prohibitory measures preventing the execution of the orders or resolutions appealed from shall be issued without notifying and hearing the Board.

On the other hand § 6 grants the Racing Board among the powers to regulate all matters concerning the racing sport "to determine and establish by regulation the practices that are undesirable and prohibited as detrimental to the best development of the racing sport," and subsections 20 and 21 of § 1001 of the Racing Regulations declare as un-

desirable practices (subsection 20) "to act toward or address in a vulgar or coarse way or to be disrespectful to any official or employee of the Administration" and (subsection 21) "to make statements which are false and detrimental to the horse racing sport and the making of such statements about persons connected with the same." As it will be recalled the statements made by plaintiff-petitioner to the newspaperman were: "that he felt depressed, persecuted, and oppressed and he was planning to go to the city of New York to continue there working as a jockey since it was impossible for him to work here," and when the newspaperman reminded him that plaintiff-petitioner, as a jockey, had been the most successful jockey in the year 1963 and that in 1964 he was in the first place with 16 or 17 victories, plaintiff-petitioner answered "that he gave said leadership to the members of the jury as a present so they could do what they wanted with it."

The most flexible rule to judge the merits of an administrative adjudication, especially when a constitutional challenge is made, is to examine the provisions of law as well as the application thereof made by the officers in charge of it in order to determine whether by virtue of the informality of the proceeding provided by the statute or of the discretion granted to the officer a right of the petitioner has been injured. Sometimes the injury of a right accrues from the confiscatory proceeding provided by the act itself and, on other occasions, it is the unreasonable attitude of the officer who should apply the law. As it may be easily concluded an officer willing to apply with circumspection and discretion the restrictive measures of a statute may cover any deficiencies of the act to follow the constitutional mandate. We believe that one of the ideals which a public officer must develop is to avoid the discredit of the law and to make evident his interest in that the law be as equitable as possible for everyone. Some officers believe that the discre-

tion granted to them by law is to act as freely as possible in pursuit of the specific purposes of the law or the superior reason of justice. Not long ago we had to express ourselves on this excess, and say: "Administrative discretion is not absolute. No court should be willing to convert the administrative discretion into magic term that would allow arbitrariness. Judgment is discreet, if, in addition to being based on reasonability, it is supported by a clear notion of justice in its plain sense." *Rodríguez* v. *Sec. of Public Works*, 86 P.R.R. 245–252 (Belaval) (1962).

As to licenses, we have long been insisting with Administrative Boards on their obligation of being in constant vigilance to avoid any injury to petitioner's right due to the informality of the proceeding or of the enervation of constitutional requirements which are attached to the Administrative Law as the shadow is to the body. Each time one thinks of a law which grants an officer the power to act, one should also think of the body of inalienable principles which orders all our civil status. In the case of *Hernández* v. *Insular Racing Commission*, 50 P.R.R. 96, 98 (Wolf) (1936), we expressed ourselves as follows:

"The Act governing horse racing in Puerto Rico at the time of this case was Act No. 11 of 1932 [p. 194], wherein the Insular Racing Commission was authorized to make certain rules and to delegate power to act thereon to a jury appointed by the Commission for the direct supervision of the races. Under the power given by this act, the Racing Commission formulated Rule 96 for juries, subdivision (h) of which reads as follows:

'(h) Before imposing any penalty, it (the jury) shall carry out, as far as possible, an investigation of the acts complained of, taking all testimony under oath and giving the offender an opportunity to be heard in his defense.'

"We agree that it was not the intention of the framers that all the solemnities of a trial should be observed. A jury of a racing park is not qualified to carry out a complete trial. We are quite sure that a great deal less formality is required. We

think it might be enough if the witnesses and the offender were summoned, sworn, and examined in an informal way and the jockey given an opportunity to call other witnesses, perhaps some of the other jockeys in the race. However this may be, the plaintiff-appellee was given no opportunity to defend. What happened to Hernández was a near approach to what happens at the end of certain criminal trials when the court asks a defendant whether he has any reason to express why sentence should not be pronounced. If an injunction lay for failure to perform the provisions of Rule 96, *supra*, this was a clear case falling under it."

In the case of *Las Monjas Racing Corp.* v. *Racing Commission*, 67 P.R.R. 42, 49–50 (De Jesús) (1947), we insisted again on the same thing:

"Since it is a cancellation or revocation of the license, did the Commission act within the authority granted under § 7 of the Racing Act of Puerto Rico, providing that 'for the cancellation of any of the licenses issued by the Insular Racing Commission, the latter shall grant the party a previous hearing and the opportunity to defend himself?' The Commission notified the petitioner of the charges and set a day for hearing. On that day the petitioner appeared and denied the charges, but the Commission failed to present any evidence in support thereof, alleging that through an investigation which they had previously carried out, they had learned that the deficiencies had not been corrected.

"This is not the hearing contemplated by law. In *Int. Com. Comm.* v. *Louis. & Nash., R.R.*, 227 U.S. 88, 93 (1913), the Court said:

'The Commission is an administrative body and, even where it acts in a quasi-judicial capacity, is not limited by the strict rules, as to the admissibility of evidence, which prevail in suits between private parties. *Int. Com. Comm.* v. *Baird*, 194 U.S. 25. But the more liberal the practice in admitting testimony, the more imperative the obligation to preserve the essential rules of evidence by which rights are asserted or defended. In such cases the Commissioners cannot act upon their own information as could jurors in primitive days. All parties must be fully apprised of the evidence submitted or to be considered,

and must be given opportunity to cross-examine witnesses, to inspect documents and to offer evidence in explanation or rebuttal. In no other way can a party maintain its rights or make its defense. In no other way can it test the sufficiency of the facts to support the finding; for otherwise, even though it appeared that the order was without evidence, the manifest deficiency could always be explained on the theory that the Commission had before it extraneous, unknown but presumptively sufficient information to support the finding. *United States* v. *Baltimore & Ohio S.W.R.R.*, 226 U.S. 14.'

"This same doctrine was followed in *Crowell* v. *Benson*, 285 U.S. 22, 48 (1932), and *Moran* v. *School Committee of Littleton*, 59 N.E.2d 279, 281 (Mass. 1945)."

The third case we shall quote is that of *Archilla* v. *Racing Commission*, 72 P.R.R. 397, 402, 403 (Marrero) (1951).

"From the case at bar it appears that the petitioners were horse owners; that they registered the horses in their names in the Insular Racing Commission, and that when they requested the renewal of their licenses, the Commission refused to issue them without a hearing, without an opportunity to defend themselves, and without stating the grounds on which it based its refusal.

"We admit that in harmony with the provisions of the Act, the respondent Commission was fully empowered to adopt regulations which, once they were approved by the Governor, had the force of law. Also, that in behalf of the racing sport the Commission was empowered to refuse the application of any license related to the sport of racing. Nevertheless, it has been repeatedly held that when by legislation the state delegates in a governmental agency the power to issue licenses to practice a profession, or become engaged in a business or occupation which is not inherently detrimental to public welfare, such a license, once granted, becomes a valuable personal right that can in no way be subsequently revoked or impaired except by due notice and a just and fair hearing in an unbiased court or board. In the present case, we repeat, petitioners were granted licenses as horse owners which, by express provision of § 44 of the Regulation, expired December 31 of each year, and had to be renewed from year to year in case the persons to whom they

were granted so desired. Under the above stated circumstances, the refusal to renew their licenses was equivalent, as stated by the court *a quo,* to their cancellation, and the respondent Commission could not, under its power to renew licenses each year, prejudice petitioners' right to obtain them, unless it ordered the holding of a hearing, gave them the opportunity to be heard and decided that there were grounds of importance to refuse their issuance. See § 7 of Act No. 11 of 1932 as it appears in footnote 3; *Las Monjas Racing Corp.* v. *Racing Commission,* 67 P.R.R. 42, 46; *State* v. *Otterholt,* 15 N.W.2d 529, 531; *Leakey* v. *Georgia Real Estate Commission,* 55 S.E.2d 818, 819; *State* v. *Swearingen,* 22 N.W.2d 809, 812; XLV Columbia Law Review (1945), p. 67 *et seq.;* and Gellhorn, Administrative Law, Second Edition, 1947, p. 275.

"Since petitioners were not given an opportunity to be heard, the decision of the Commission refusing the licenses applied for was contrary to law. The lower court therefore was correct in entering the judgment it did."

On the vigilance of the judicial power as to the arbitrariness of the administrative award, in the case of *Debién* v. *Board of Accountancy,* 76 P.R.R. 91, 98, 99, (Ortiz) (1954), we stated:

"We are concerned here with licenses regulated by the State. The Legislature has validly delegated to a Board the power to grant or refuse such licenses, and, like other administrative agencies, the Board should have ample discretionary powers to weigh the relevant facts and factors particularly in view of the experience and specialized knowledge of the members of that agency. Generally, an administrative board may be invested with discretion to ascertain and determine the qualifications and conditions of applicants for licenses, as well as the facts and conditions required by the statute; and to determine whether the legal provisions have been complied with, in accordance with the generally accepted meaning of the statutory terms. 33 Am. Jur. 377, 378, 379. The legislature lays down general standards of such breadth as to give the administrator leeway for his expert judgment, the agency being permitted to develop within an area of administrative analysis, appreciation and discretion, provided that discretion rests on a basis of reasonableness.

*Secretary of Agriculture* v. *Central Roig Co.,* 338 U.S. 604, 611; *Gray* v. *Powell,* 314 U.S. 402, 412; *Board* v. *Hearst Publications,* 322 U.S. 111; *Board of Governors* v. *Agnew,* 329 U.S. 441; 58 Harv. L. Rev. 70 *Review of Findings of Administrators, Judges, and Juries: A Comparative Analysis.* However, the judicial respect for the relative freedom of action of administrators cannot go so far as to lead to passive indifference and total complacency. The 'desideratum' of administrative autonomy does not warrant absolute independence from judicial interference. The sphere of discretion must be within legal bounds. Administrative discretion is not absolutely unlimited. The discretion of a board must rest on a rational basis in the evidence. The decisions of a board as respects the granting or refusal of licenses cannot be arbitrary, capricious, fraudulent or without factual basis. 33 Am. Jur. 379; *McDonough* v. *Goodell,* 13 Cal.2d 741; *Riley* v. *Chambers,* 181 Cal. 589; *Jaffarian* v. *Murphy,* 183 N.E. 110; *Hazel Park Racing Ass'n* v. *Inglis,* 58 N.W.2d 241; *American Committee on Maternal Welfare* v. *Mangan,* 14 N.Y.S.2d 39, affirmed in 27 N.E.2d 278; *Farrand* v. *State Medical Board,* 85 N.E.2d 113. Application of the test of reasonableness prevails in the exercise of administrative discretion 62 Harv. L. Rev. 1058, 1059."

Applying the flexible rule which permits us to consolidate in a sole question of law the provisions of the act and the discretion of the administrator who applies it in order to remedy any deficiencies of the law, we believe we are face to face with a case in which there is no need to consider any state of unconstitutionality of the statute, because the deficiencies in the informality of the proceeding may be remedied by a reasonable opportunity of defense granted by the discretion of the Administrator or of the Administrative Board in charge of applying the law. There can be no text nor refinement of interpreter which can eliminate the opportunity to be heard before cancelling a license issued by the State, expressly conferred by our Constitution.

Said opportunity should be granted to plaintiff-petitioner and he should be permitted to have legal aid in order to

object, defend, and protect in the sphere of Administrative Law the power to act of the "Administration" and petitioner's right to continue enjoying his right of property. Perhaps subsections 20 and 21 of § 1001 of the Regulations strictly applied to reasonable exercise of the freedom of speech and of the right to bring the corresponding grievances against the State—in this case against the officers of the Administration—may create a constitutional injury. Nevertheless we would need a more complete gamut of the different tones than the one offered as yet by the assumptions of the evidence. Although the violation of subsection 20 seems to us a reasonable exercise of the freedom of speech, we are not so sure as to the second. We agree likewise that neither the Racing Jury, nor the Administrator, nor any other racing authority has power to cancel plaintiff-petitioner's license without complying with the minimum requirements of due process of law, and any action in that sense is null and void. The suspension imposed in that manner should be eliminated from plaintiff-petitioner's record in the files of the Administration.

This case leaves a certain uneasiness in our conscience, an excess of restriction at the time of filing a grievance as well as at the time of requesting a reasonable remedy. We are fully aware that the "administration" of certain individual rights should not be carried out in the strict manner created by the excess of legality and procedural formulism of the XIX century but likewise we should not permit that an entire system of human law be diluted within the magic of "administration."

Bodenheimer, the famous author of *Jurisprudence*, of great reputation among the scholars of our sciences, has posed the problem in the following manner:

"Morals, customs, and law are not the only agencies of social control in modern political society. There is in the modern state another instrument of social regulation, which is called 'ad-

ministration.' It is constantly increasing in scope and importance . . . . No modern treatise on jurisprudence can be complete without a discussion of the relation between law and administration yet there are few fields in which so much confusion of thought prevails. This is particularly true of administrative law, where administration and law are directly confronted with each other . . . . There is hardly a problem which is so closely interwoven with the fundamental questions of jurisprudence as the problem of administrative law. The discussion must start with a definition of the term 'administration.' 'Administration' is the regulation of private or public affairs according to the principle of expediency . . . . Administration in its essence is an exercise of power. Public administration, in particular, is a sphere of free activity by the government. The guiding directive of public administration is the principle of expediency and the will to achieve certain practical results through the application of the most efficient means. Public administration not limited by law is pure power rule. A purely administrative state as the experiences of modern totalitarian states have amply demonstrated . . . tends to obliterate the difference between power and law and thus to render the notion of law void and meaningless. A nation which no longer realizes the difference between legal and administrative regulations may easily lose its liberty and law without even noticing it . . . . Administrative law is not concerned with the transmission of the will of the state in any of its forms. It is concerned with the *limits* which are set to the exercise of this will. Nor is administrative law concerned with the discretion given to administrative officials. It is concerned, on the contrary, with the *restraints* upon such discretion. Administrative law should be defined as the law relating to the limitations upon the powers of administrative officials and boards. It would lose its character as a branch of the law if its function consisted in enumerating and describing the executive or discretionary powers vested in administrative agencies . . . . Frankfurter gives the following definition: 'Administrative law deals with the field of legal control exercised by law-administering agencies other than courts, and the field of control exercised by courts over such agencies.' These definitions bring to light certain important elements in administrative law. This branch of the law is designed to safeguard the rights of individuals

or groups against undue encroachments by administrative agencies. It determines and circumscribes the sphere of action within which the administrative agencies must operate; it also indicates the remedies which are open to the citizens in case this sphere of action is transcended by the administrative organ. The control which is exercised by the law courts over the administrative agencies is, above all, designed to prevent or remedy any violations of individual rights by administrative acts. The delimitation of this field of control is therefore one of the most essential functions of administrative law. The argument might be raised that frequently a statute or rule of law does not limit the power of executive officials, but, on the contrary, grants and conveys certain powers to them. Does a statute which contains a grant of administrative powers but no express limitation upon the exercise of such powers forfeit the quality of an act of law? It would seem rather absurd to examine every statute or legal provision with a view to determining whether it contains a *grant* or rather a *limitation* of power, and only in the latter case to honor it with the attribute of an 'act of law.' In order to determine whether a government is a 'government of laws' it is necessary to look at the legal order as a whole. It must be determined whether the power of the government is limited and to what extent and what safeguards exist against arbitrary acts of public officials. It must be ascertained what restrictions upon the activity of the government are established by general rules of law or statutory enactments. If the sphere of free and unrestricted activity by the government becomes very wide and if the remedies of individuals or groups against invasion of their private sphere are taken away or greatly curtailed, law is on its way toward abdication . . . . Law is mainly concerned with rights; administration is mainly concerned with results. Law is conducive to liberty and security, while administration promotes efficiency and quick decision. The dangers of law are rigidity and stagnation; the dangers of administration are bureaucracy and autocracy . . . . A great number of administrative agencies has grown up in quick succession. There is a certain tendency to take away or curtail judicial review of administrative action. The low estimate in which administrative power was held in the last century has in many quarters given way to an exaggerated praise of its blessings. It is not always realized that power, if it appears in

the form of administrative discretion, still remains power and, unless checked by legal restraints, is subject to abuse. The example of the totalitarian states demonstrates amply and clearly that a purely administrative state has little regard for the dignity and the rights of the human personality." See: EDGAR BODENHEIMER—JURISPRUDENCE 86–96 (1940 ed.).

The judgment rendered by the San Juan Part of the Superior Court of Puerto Rico of July 31, 1964, should be reversed and the case remanded for further proceedings in said court for the hearing on the merits of the instant case.