**SECURITIES INDUSTRY ASSOCIATION,**
Petitioner,

v.

**BOARD OF GOVERNORS OF the FEDERAL RESERVE SYSTEM, et al., Respondents,**

and

**BankAmerica Corporation, Intervenor.**

No. 1372, Docket 83–4019.

United States Court of Appeals, Second Circuit.

Argued May 23, 1983.

Decided July 15, 1983.

As Amended Sept. 20, 1983.

Certiorari Granted Jan. 23, 1984.
See 104 S.Ct. 994.

---

James B. Weidner, New York City (Rogers & Wells, New York City, John M. Liftin, Harry M. Yohalem, David A. Schulz, Mark Holland, Bruce E. Braverman, and Donald J. Crawford, Washington, D.C., William J. Fitzpatrick, New York City, of counsel), for petitioner Securities Industry Assn.

Gary D. Wilson, Washington, D.C. (Wilmer, Cutler & Pickering, Washington, D.C., Arnold M. Lerman, Alan S. Tenenbaum, and H. Helmut Loring, William S. MacKay, Janice Decker, San Francisco, Cal., of counsel), for intervenor BankAmerica Corp.

Richard M. Ashton, Atty., Board of Governors of the Federal Reserve System, Washington, D.C. (Michael Bradfield, Gen. Counsel, Kevin J. Handly, Atty., Board of Governors, and J. Paul McGrath, Asst. Atty. Gen., Civ. Div., Dept. of Justice, Washington, D.C., of counsel), for respondents Board of Governors of the Federal Reserve System.

Robert S. Rifkind, New York City (Cravath, Swaine & Moore, Stephen S. Madsen, and Deborah S. Prutzman, Vice President and Counsel, The New York Clearing House Ass'n, New York City, of counsel), for The New York Clearing House Ass'n, amicus curiae.

Before FEINBERG, Chief Judge, and LUMBARD and WINTER, Circuit Judges.

LUMBARD, Circuit Judge:

On January 7, 1983 the Federal Reserve Board authorized the BankAmerica Corporation, a bank holding company, to acquire the Charles Schwab Corporation, the sole owner of Charles Schwab & Co., the nation's largest "discount" brokerage firm. The Securities Industry Association (SIA), a national trade association representing over 540 securities brokers, dealers, and investment banking companies, petitions for judicial review of the Board's order. SIA contends that the acquisition approved by the Board violates both the Glass-Steagall Act and the Bank Holding Company Act. We find, however, that neither of those Acts prohibits a bank holding company from engaging in retail brokerage, and that the Board acted well within its discretion in approving BankAmerica's application. We therefore deny SIA's petition for review and affirm the order of the Board.

The BankAmerica Corporation (BAC), with total assets of $120.5 billion, is the second largest bank holding company in the United States. BAC's most important sub-

sidiary is the Bank of America (Bank) which, with domestic deposits of $52 billion, is the nation's largest commercial bank. Charles Schwab & Co. (Schwab) is principally engaged in retail securities brokerage. Schwab buys and sells securities solely as agent, on the order and for the account of its customers. Schwab offers its brokerage customers incidental services including margin loans, securities custodial services, and "sweep" accounts in which net balances awaiting investment are deposited in a money market fund not affiliated with Schwab. Schwab does not, however, offer its customers investment advice and, with minor exceptions not here relevant, does not underwrite or deal in securities. Schwab and similar firms are called "discount brokers" because the commissions they charge typically are significantly lower than those charged by full-service brokerage firms which offer investment advice. Schwab, headquartered in San Francisco, operates nationwide with offices in 26 states and the District of Columbia. Although, by revenue, Schwab currently holds 9% of the discount brokerage market, it holds less than 1% of the total retail brokerage market.

On March 8, 1982 BAC applied to the Federal Reserve Board for permission to acquire 100% of the stock of Schwab's parent corporation. BAC filed its application under § 4(c)(8) of the Bank Holding Company Act, 12 U.S.C. § 1843(c)(8) (1976), which authorizes the Board to approve a bank holding company's acquisition of a subsidiary if the subsidiary's activities are "closely related" to banking and if the public benefits reasonably to be expected from the acquisition outweigh possible adverse effects. The Board published notice of BAC's application in the Federal Register, 47 Fed.Reg. 16,104 (1982), and requested comments from interested parties. The Antitrust Division of the Department of Justice, the Comptroller of the Currency, and the Securities and Exchange Commission all filed comments in support of the application. SIA opposed the application and requested the Board to conduct a formal hearing. An administrative law judge held an evidentiary hearing in September, 1982, and on November 12, 1982, issued his decision recommending that the acquisition be approved. The judge found the proposed acquisition to be consistent with both the Glass-Steagall Act and the Bank Holding Company Act. On January 7, 1983 the Board adopted the judge's findings and conclusions, with modifications, and authorized BAC to acquire Schwab. 69 Fed.Res.Bull. 105 (1983). SIA petitions for review under 12 U.S.C. § 1848 (1976).

## I. *Glass-Steagall Act*

Those provisions of the Banking Act of 1933 that mandated a separation of the commercial and investment banking industries are known as the Glass-Steagall Act. *See* Pub.L. No. 73–66, §§ 16, 20, 21, & 32, 48 Stat. 162 (1933). SIA claims that the Glass-Steagall Act prohibits bank holding company subsidiaries from conducting a retail brokerage business. Although SIA's claim raises an issue of law which we have the ultimate responsibility to decide, *see* 5 U.S.C. § 706 (1976), the Board's thorough opinion rejecting the claim is entitled to substantial deference. Because the Board has both primary responsibility for implementing the Glass-Steagall Act and expert knowledge of commercial banking, we must uphold its interpretation of the Act if it is reasonable. *See Board of Governors v. Investment Co. Ins.,* 450 U.S. 46, 56 n. 21, 101 S.Ct. 973, 981 n. 21, 67 L.Ed.2d 36 (1981), quoting *Board of Governors v. Agnew,* 329 U.S. 441, 450, 67 S.Ct. 411, 415, 91 L.Ed. 408 (1947) (Rutledge, *J.,* concurring); *Investment Co. Inst. v. Camp,* 401 U.S. 617, 626–27, 91 S.Ct. 1091, 1097, 28 L.Ed.2d 367 (1971); *A.G. Becker Inc. v. Board of Governors,* 693 F.2d 136, 140–41 (D.C.Cir.1982). We conclude that the Board's interpretation was reasonable and entirely consistent with the Act's language and policy.

Only one of the Glass-Steagall Act's four provisions is directly applicable to bank holding companies. That provision, § 20, 12 U.S.C. § 377 (1976) states:

(N)o member bank shall be affiliated in any manner ... with any corporation, association, business trust, or other similar organization *engaged principally in the issue, flotation, underwriting, public sale, or distribution* at wholesale or retail or through syndicate participation of stocks, bonds, debentures, notes, or other securities ...

(emphasis supplied). As a bank holding company's various subsidiaries are bank affiliates for purposes of § 20, *see* 12 U.S.C. § 221a(b) (1976), BAC's acquisition of Schwab will make Schwab an affiliate of Bank. Section 20 therefore prohibits the acquisition if Schwab is "engaged principally" in any of the activities listed in the statute. Although SIA concedes that Schwab is not engaged in the issue, flotation, underwriting, or distribution of securities, it argues that Schwab's retail brokerage business does constitute the "public sale" of securities.

SIA's interpretation of "public sale" to include brokerage is rebutted by the "familiar principle of statutory construction that words grouped in a list should be given related meaning." *Third Natl. Bank in Nashville v. Impac, Ltd.,* 432 U.S. 312, 322, 97 S.Ct. 2307, 2313, 53 L.Ed.2d 368 (1977) (footnote omitted). *See also General Elec. Co. v. OSHRC,* 583 F.2d 61, 65 (2d Cir.1978). The terms "issue," "flotation," "underwriting," and "distribution" all refer to the widespread marketing of specific issues of new securities in which the dealer trades as principal for his own profit. *See generally* 1 L. Loss, Securities Regulation 159–72 & 547–53 (2d ed. 1961). Such activities greatly differ from retail brokerage, in which the broker trades as an agent for commission, not as a principal for profit, and does not transfer title. Thus if "public sale" is to be given a meaning similar to that of the terms that surround it, it cannot be read to encompass retail brokerage. Moreover, if Congress had intended § 20 to cover brokerage, it presumably would have used words more precise than "public sale." Sec-

tion 16 of the Act, 12 U.S.C. § 24(7) (1976), authorizes banks to engage in "purchasing and selling ... securities and stocks without recourse, solely upon the order, and for the account of, customers." Congress' use in § 16 of language that specifically refers to brokerage,[1] and its omission of similar terms from § 20, suggests that Congress did not intend § 20 to cover brokerage. *See FTC v. Sun Oil Co.,* 371 U.S. 505, 514–15, 83 S.Ct. 358, 364, 9 L.Ed.2d 466 (1963) (terms carefully employed by Congress in one place, and excluded in another, should not be implied where excluded).

The Board's ruling that § 20 does not encompass brokerage is supported by its long-standing interpretation of a different provision of the Glass-Steagall Act, § 32, 12 U.S.C. § 78 (1976). Section 32 prohibits managerial or other interlocks between member banks and any entity primarily engaged in "the issue, flotation, underwriting, public sale, or distribution" of securities. Section 32's list of prohibited activities is precisely that found in § 20. In January, 1936, shortly after the Banking Act of 1935 revised § 32 into its present form, the Board ruled that "(a) broker who is engaged solely in executing orders for the purchase and sale of securities on behalf of others in the open market is not engaged in the business referred to in section 32." 22 Fed.Res.Bull. 51 (1936). The Board's interpretation of § 32, to which it still adheres, *see* 12 C.F.R. § 218.1 n. 1, has been confirmed by the Supreme Court. In *Board of Governors v. Agnew,* 329 U.S. 441, 67 S.Ct. 411, 91 L.Ed. 408 (1947), two directors of a national bank also worked for a securities firm which derived approximately 32% of its gross income from underwriting, and 42% from brokerage. The Board ruled that the directors' outside firm was "primarily engaged" in activities covered by § 32, and it ordered the directors to resign from the bank. The directors challenged the Board's order in court. The District of Columbia Court of Appeals, by a divided vote, held

---

1. The scope of the brokerage activities which § 16 authorizes banks to conduct is open to debate. *See infra.*

that enforcement of the Board's order should be enjoined. 153 F.2d 785 (1946). The majority and dissenting opinions in the Court of Appeals agreed that § 32 does not cover brokerage. 153 F.2d at 790, 795. They disagreed only on the degree of involvement necessary for a firm to be "primarily" engaged in the activity prohibited by § 32. The Supreme Court granted certiorari and reversed. The Court concluded, as had the dissenting judge in the Court of Appeals, that a firm is "primarily" engaged in a prohibited activity if it is "substantially" so engaged, and that the Board's order was therefore lawful notwithstanding the fact that the directors' outside firm earned less than half of its revenue from underwriting. Although the Court did not explicitly rule brokerage to be excluded from § 32, it did distinguish the firm's brokerage income from its underwriting income, and used the language of § 32 to define "underwriting" as the "issue, flotation, underwriting, public sale or distribution" of securities. 329 U.S. at 445 n. 3, 67 S.Ct. at 413 n. 3. It thus seems clear that the Court read § 32 to exclude brokerage. Indeed, if the Court had not so read the statute, it would not have had to explore the meaning of "primarily engaged," since the directors' outside employer was, under any interpretation of the term, "primarily engaged" in underwriting and brokerage taken together. Use of the same language in different statutory provisions, where the various provisions were enacted together and concern the same general goals, is a strong indication that Congress intended the language to have the same meaning wherever it appears. *See Northcross v. Board of Educ. of the Memphis City Schools,* 412 U.S. 427, 428, 93 S.Ct. 2201, 2202, 37 L.Ed.2d 48 (1973); *Hargrave v. Oki Nursery, Inc.,* 646 F.2d 716, 720 (2d Cir.1981). The Board's consistent interpretation excluding brokerage from § 32 is thus, especially in view of *Agnew,*

strong evidence that brokerage is excluded from § 20.[2]

■ The policies behind the Glass-Steagall Act shed further light on the proper interpretation of § 20. Congress intended the Act to address two principal concerns. First and foremost, Congress believed that commercial bank involvement in underwriting and securities speculation had unduly placed bank assets at risk and had contributed to "the widespread bank closings that occurred during the Great Depression." *Board of Governors v. Investment Co. Inst.,* 450 U.S. 46, 61, 101 S.Ct. 973, 984, 67 L.Ed.2d 36 (1981) (footnote omitted). Securities trading had impaired bank solvency not only directly through bad investments by banks, but also indirectly through the unsound banking practices that securities trading promoted. In particular, Congress recognized that a bank trading for its own account has a "salesman's interest" that is inconsistent with the traditional role of banks as impartial extenders of credit. A bank seeking to sell the stock of a particular company might, for example, extend customers credit to be used for purchase of the stock or might grant the company an unsound loan simply to improve the stock's marketability. *See Investment Co. Inst. v. Camp,* 401 U.S. 617, 631, 91 S.Ct. 1091, 1099, 28 L.Ed.2d 367 (1971). Similarly, a bank that engages in trading through a securities affiliate might improperly extend credit to the affiliate, or to companies in which the affiliate invested, in order to avoid the loss in public confidence it would experience if the affiliate failed. Securities trading further shakes public confidence in banks because it associates banks with speculative ventures, and because some customers purchasing securities on bank representations will inevitably suffer losses. This loss of public confidence poses an additional threat to bank solvency. *See id.,* 401 U.S. at 631–32, 91 S.Ct. at 1099. Thus in strictly limiting the right of commercial banks to trade

2. Also significant is the Supreme Court's comment in *Board of Governors v. Investment Co. Inst.,* 450 U.S. 46, 58 n. 24, 101 S.Ct. 973, 982 n. 24, 67 L.Ed.2d 36 (1981), that § 20 prohibits bank ownership of securities affiliates that are

engaged principally "in the issuance or underwriting of securities." The Court's failure to include "brokerage" in the list of activities covered by § 20 is a further suggestion that brokerage is excluded from the statute.

in securities, Congress sought to ensure bank solvency, to protect bank depositors, and to maintain public confidence in the nation's banks. Second, Congress recognized the inherent conflict between the promotional role of an investment banker and the commercial banker's obligation to give disinterested investment advice. A commercial bank that trades as a principal might allow its interest in trading profits to override the fiduciary duties owed to depositors. *See id.,* 401 U.S. at 633, 91 S.Ct. at 1101. Congress thus intended the Glass-Steagall Act to guarantee that the impartiality of investment advice would not be "tainted by a desire to profit from the promotion of one particular security over another." Note, *A Conduct-Oriented Approach to the Glass-Steagall Act,* 91 Yale L.J. 102, 104 (1981) (footnote omitted).

Schwab's brokerage services do not present any of the dangers which the Glass-Steagall Act was designed to forestall. Because Schwab trades only as an agent, and never as a principal, its assets are not subject to the risks of the securities markets. Equally important, Schwab's lack of a "salesman's interest" in the securities it trades eliminates the incentive for the Bank to engage in promotional activities. Schwab's revenue depends solely on the volume of shares traded, and is not dependent upon the sale or purchase of specific securities. Thus the Bank cannot increase Schwab's profits by extending credit to securities issuers to bolster their stock or to purchasers for the purchase of specific shares, or by improperly favoring particular securities in its management of customers' assets. Although Schwab and the Bank will be associated with one another in the public eye, the losses that some customers will sustain on trades executed through Schwab will be unlikely to impair public confidence in the Bank. Given Schwab's strict policy not to offer investment advice, customers who trade unsuccessfully will have only themselves, and not Schwab or the Bank, to blame for their mistakes.

The Act's legislative history and Supreme Court precedent support our interpretation of the Act's focus. First, the legislative history, though it discusses at length the dangers posed by commercial bank involvement in underwriting and securities speculation, *see e.g.,* S.Rep. No. 77, 73d Cong., 1st Sess. 8–10 (1933), makes but passing reference to bank brokerage activity. The Senate report states only that the Act allows banks to "purchase and sell investment securities for their customers to the same extent as heretofore." *Id.* at 16. This statement hardly suggests that brokerage was one of Congress' principal concerns. Second, in *Investment Co. Inst. v. Camp, supra,* the Supreme Court drew a clear distinction between brokerage and activities in which a bank trades as a principal. In *Camp,* the Court held that a bank's plan to distribute shares in a bank-managed open-end investment fund would constitute an impermissible underwriting of securities in violation of § 16 of the Act. The Court emphasized that the bank would have a salesman's stake in the fund's shares, and thus would have an incentive to engage in promotional activities contrary to the Act's policy. The Court contrasted the bank's plan with brokerage services, and stated that the hazards associated with promotional activities "are not present when a bank undertakes to purchase stock for the account of its individual customers." 401 U.S. at 638, 91 S.Ct. at 1102. The Court stated that purchases on account "do not give rise to a promotional or salesman's stake in a particular investment; ... do not entail a threat to public confidence in the bank itself; ... and do not impair the bank's ability to give disinterested service as a fiduciary or managing agency." *Id.* The Court's comments, though dicta, strongly suggest that Congress did not intend § 20 to prohibit bank affiliates from engaging in retail brokerage. *See also New York Stock Exchange, Inc. v. Smith,* 404 F.Supp. 1091, 1099–1100 (D.D.C.1975) (bank's plan to purchase securities on account for customers, and automatically to deduct designated purchase amount from customers' bank accounts, held to be consistent with the Act), *vacated on other grounds,* 562 F.2d 736 (D.C.Cir.1977), cert.

*denied,* 435 U.S. 942, 98 S.Ct. 1520, 55 L.Ed.2d 538 (1978).

We thus find the Board's ruling to be supported by both the language of § 20 and the Act's policy. SIA argues, however, that § 20's true meaning cannot be found without reference to § 16 of the Act, 12 U.S.C. § 24(7) (1976), which defines the extent to which commercial banks may trade in securities. Section 16 states, in pertinent part, that:

> The business of dealing in securities and stock by [a national bank] shall be limited to purchasing and selling such securities and stock without recourse, solely upon the order, and for the account of, customers, and in no case for its own account.

Although SIA concedes, as indeed it must, that § 16 is directly applicable only to banks, and not to bank holding companies, *see Board of Governors v. Investment Co. Inst.,* 450 U.S. 46, 58 n. 24, 101 S.Ct. 973, 982 n. 24, 67 L.Ed.2d 36 (1981), it argues that §§ 16 and 20 must be interpreted "consistently," and cannot be read to permit bank holding companies a broader degree of brokerage activity than is allowed to banks. SIA contends that § 16 does not authorize banks to conduct retail brokerage businesses such as Schwab's. SIA's position is supported by certain early rulings by the Comptroller of the Currency which held that § 16 authorizes a bank to engage in brokerage only if (1) the customer has a customer relationship with the bank independent of the brokerage transaction, (2) the bank offers its brokerage services at cost, and (3) the customer makes prior payment or has assets at the bank sufficient to cover his transaction. *See, e.g.,* 1 Bulletin of the Comptroller of the Currency, No. 2 at 2–3 (1936). Relying principally upon the Comptroller's rulings, SIA argues that banks may engage in brokerage only to accommodate existing customers, and that the principal brokerage activities of bank holding companies must, under a consistent

interpretation of the Act, be similarly limited.

The proper interpretation of § 16 is before us only incidentally, and we do not think it necessary to explore the question in detail. Instead, three considerations convince us that SIA's attempt to transfer the focus of this case from § 20 to § 16 is unavailing. First, the Comptroller of the Currency recently reversed the rulings upon which SIA relies. In *Security Pacific Natl. Bank,* [Current] Fed.Bank.L.Rep. ¶ 99,284 (CCH) (1982), the Comptroller held that § 16 authorized a national bank to establish a subsidiary that would offer discount brokerage services to the public but would not offer investment advice. The Comptroller stated that his earlier restrictive rulings reflected "the great caution of banking regulations in the years immediately following the 1931–32 debacle," and were not supported by either the purposes or the express language of the Glass-Steagall Act. Because we agree with the Comptroller that the Act's policies are not contravened by bank participation in retail brokerage, we are inclined to give significant weight to the Comptroller's repudiation of his earlier rulings.[3]

■ Second, SIA has not convincingly explained why §§ 16 and 20, notwithstanding Congress' use of very different language in the two provisions, must be interpreted alike. If, as SIA contends, Congress intended in §§ 16 and 20 significantly and equivalently to restrict the brokerage activities of banks and bank holding companies, it presumably would have used the same, or at least similar, language in both statutes. Finally, the structure of the Act "reveals a congressional intent to treat banks separately from their affiliates," *Investment Co. Inst., supra,* 450 U.S. at 59 n. 24, 101 S.Ct. at 983 n. 24, and clearly indicates that the same prohibitions do not apply to both. Banks, for example, under § 16 can never underwrite or deal in the securities of pri-

---

**3.** SIA has brought an action in the District Court for the District of Columbia challenging the Comptroller's ruling in *Security Pacific Natl. Bank. Securities Industry Assoc. v. Con-* *over,* No. 82–2865 (D.D.C. filed October 6, 1982). What we say here is not meant to express an opinion on the validity of the Comptroller's ruling.

vate issuers, while bank holding companies, under § 20, can engage in such underwriting and dealing so long as they are not principally so engaged. SIA argues that this distinction between §§ 16 and 20 is unimportant; that the same *types* of activities are prohibited to banks and to bank holding companies; and that bank holding companies, even if they can partially engage in certain activities totally barred to banks, cannot principally engage in such activities. SIA thus concludes that § 20 at most authorizes Schwab minimally to engage in retail brokerage, and does not allow it to make brokerage a principal line of business. We think, however, that the latitude the Act grants bank holding companies partially to engage in activities such as underwriting, which implicate the Act's policies whether conducted by banks or by bank holding companies, suggests that bank holding companies can, under the Act, be allowed principally to engage in activities which pose the dangers the Act addressed only when conducted by banks. Congress clearly intended the Act to restore banking as the principal business of banks, and may have believed (though we see no support for the point in the legislative history) that banks would be unreasonably diverted from banking by participation in retail brokerage. But even if Congress, because of such concerns, restricted in § 16 the brokerage activities allowed to banks, no similar danger of diversion is posed by the brokerage activities of bank holding companies. Thus even if § 16 prohibits banks from acting as retail brokers, we would have to conclude,

in light of (1) the statutory language and policy considerations previously discussed and (2) the Act's clear intent to "treat banks separately from their affiliates," that Congress did not intend § 20 to prohibit bank holding companies from acquiring or establishing brokerage subsidiaries.[4]

## II. *Bank Holding Company Act*

 The Bank Holding Company Act, 12 U.S.C. §§ 1841 *et seq.* (1976), generally prohibits bank holding companies from engaging in nonbank activities. However, section 4(c)(8) of the Act, 12 U.S.C. § 1843(c)(8), provides that a bank holding company may acquire:

> shares of any company the activities of which the Board after due notice and opportunity for hearing has determined (by order or regulation) to be so closely related to banking or managing or controlling banks as to be a proper incident thereto.

Section 4(c)(8) further provides that:

> In determining whether a particular activity is a proper incident to banking or managing or controlling banks the Board shall consider whether its performance by an affiliate of a holding company can reasonably be expected to produce benefits to the public, such as greater convenience, increased competition, or gains in efficiency, that outweigh possible adverse effects, such as undue concentration of resources, decreased or unfair competition, conflicts of interest, or unsound banking practices. In orders and regula-

---

**4.** SIA also argues that the Board's order contravenes the provision of § 16 that limits national banks to "purchasing and selling such securities and stock without recourse...." SIA contends that Schwab trades "with recourse" because brokerage customers occasionally "walk away" from trades that prove unprofitable within the settlement period, leaving Schwab liable to the third party to the transaction for the purchase price or for delivery of the security. Beyond the fact that SIA has not convinced us to incorporate § 16's language into § 20, we do not think that Schwab's activities violate § 16 merely because it faces the kind of incidental liability to which SIA refers. The Supreme Court's decision in *Awotin v. Atlas Exchange Natl. Bank of Chicago,*

295 U.S. 209, 212, 55 S.Ct. 674, 676, 79 L.Ed. 1393 (1935) (holding that a repurchase agreement between the bank and one who bought bonds from it was void as a violation of § 16), strongly suggests that the limitation in § 16 is directed against endorsement or guaranty contracts "by which the bank assumes the risk of loss which would otherwise fall on the buyer of securities, or undertakes to insure to the seller the benefit of an increase in the value of securities which would otherwise accrue to the Bank." Schwab does not enter into contracts that obligate it to "assume" ultimately its brokerage customers' risks; on the contrary, it retains full power to bring actions for breach of contract against customers who fail to pay for or deliver securities.

tions under this subsection, the Board may differentiate between activities commenced de novo and activities commenced by the acquisition, in whole or in part, of a going concern.

Section 4(c)(8) authorizes the Board to approve a bank holding company's acquisition of a nonbank subsidiary only if it determines that (1) the subsidiary's activities are "closely related" to banking, and (2) the public benefits reasonably to be expected from the acquisition will outweigh possible adverse effects. *See* H.R.Conf.Rep. No. 1747, 91st Cong., 2d Sess. (1970) *reprinted in* 1970 U.S.Code Cong. & Ad.News 5561, 5572–73. *See, e.g., Independent Ins. Agents of America, Inc. v. Board of Governors,* 658 F.2d 571, 573 (8th Cir.1981); *Citicorp v. Board of Governors,* 589 F.2d 1182, 1190 (2d Cir.), *cert. denied,* 442 U.S. 929, 99 S.Ct. 2860, 61 L.Ed.2d 297 (1979); *National Courier Assn. v. Board of Governors,* 516 F.2d 1229, 1232–33 & n. 2 (D.C.Cir.1975). SIA challenges the Board's ruling that BAC's acquisition of Schwab satisfies both of these requirements.

Section 4(c)(8) and its legislative history do not identify the factors the Board is to consider in determining which activities are closely related to banking. However, in *National Courier Assn., supra,* 516 F.2d at 1237, the District of Columbia Court of Appeals held that the Board may treat an activity as one closely related to banking if there is present one or more of the following connections between the activity and the business of banking:

1. Banks generally have in fact provided the proposed services.

2. Banks generally provide services that are operationally or functionally so similar to the proposed services as to equip them particularly well to provide the proposed service.

3. Banks generally provide services that are so integrally related to the proposed services as to require their provision in a specialized form.

Although the factors listed in *National Courier Assn.* do not exhaust the possible connections which could establish a close relationship between a proposed activity and banking, *see id.,* they do usefully elucidate the closely related standard and have been employed by several of the courts of appeals, *see NCNB Corp. v. Board of Governors,* 599 F.2d 609, 613 (4th Cir.1979); *Association of Bank Travel Bureaus, Inc. v. Board of Governors,* 568 F.2d 549 (7th Cir. 1978); *Alabama Assn. of Ins. Agents v. Board of Governors,* 533 F.2d 224, 241 (5th Cir.1976), and by the Board. *See, e.g., Citicorp,* 68 Fed.Res.Bull. 505 (1982).

In this case the Board, relying upon the second of the *National Courier Assn.* factors, held that the present securities activities of banks are operationally or functionally so similar to brokerage that banks are particularly well equipped to act as retail brokers. The Board found that many banks, as an accommodation to their customers, transmit to brokers customer orders to buy or sell securities, and that the trading desks of bank trust departments routinely buy and sell securities as agents for trusts and other accounts. The Board noted one principal difference between the securities activities of brokerage houses and of banks: brokerage houses trade listed securities directly on the exchanges, while banks historically have employed intervening brokers to execute such trades, but it concluded that banks nonetheless have expertise in the methods of securities trading. The Board found that banks, when trading unlisted securities, often deal directly with dealers or other third parties, and that such trades require banks to "exercise the same type of discretion and judgment with respect to the best method of execution that brokers do with respect to similar types of orders." The Board further found that when banks employ intervening brokers, they often direct the broker on the best method of execution, and leave to the broker only the technical execution of the transaction. Finding that banks widely buy and sell securities for the accounts of their customers, and have become skilled in securities trading, the Board held that retail brokerage is an activity closely related to banking.

■ The Board's factual findings are conclusive if supported by substantial evidence, 12 U.S.C. § 1848, and the Board's findings on bank trading activities are clearly so supported. SIA, however, argues that the Board misapprehended the legal standard implicit in the closely related test. SIA claims that an activity is closely related to banking only if it facilitates actual banking practices[5] and can be conducted by most of the nation's banks. SIA argues that brokerage does not satisfy either of those requirements, and is therefore not closely related to banking. We do not agree.

■ SIA's challenge to the Board's legal conclusion must be evaluated in light of the deference ordinarily due to Board determinations under § 4(c)(8). Congress has committed to the Board primary responsibility for the administration of the Act. The Board, moreover, has expertise in commercial bank regulation that the courts do not have, and it must be allowed reasonable latitude in its application of the Act to the changing activities of banks. For these reasons the Board's determination that brokerage is closely related to banking "is entitled to the greatest deference," *Investment Co. Inst., supra,* 450 U.S. at 56, 101 S.Ct. at 981 (footnote omitted), and may be overturned only if unreasonable or inconsistent with Congressional intent. *See National Courier Assn. v. Board of Governors,* 516 F.2d 1229, 1237 (D.C.Cir.1975). We see nothing in SIA's arguments that would justify reversal of the Board's order under this standard of review.

SIA's claim that an activity must facilitate actual banking practices to be closely related to banking is, we think, refuted by the Supreme Court's decision in *Investment Co. Inst., supra.* In *Investment Co. Inst.,* the Supreme Court upheld a Board regulation issued under § 4(c)(8) that authorized bank holding company subsidiaries to serve as investment advisers to closed-end investment companies. An investment company offers small investors portfolio diversification and expert management by pooling their resources under the guidance of one manager. Investment advisers are independent of the investment companies they advise. In return for a management fee, an investment adviser selects the investment company's portfolio and supervises most aspects of its business. In affirming the Board's determination that investment advisory services are closely related to banking, the Court emphasized that such services "are not significantly different from the traditional fiduciary functions of banks." 450 U.S. at 55, 101 S.Ct. at 981. The Court stated that the principal duty of an investment adviser is to manage the investment portfolio of its client, and noted that banks, in their roles as executors, trustees, and managing agents, have for decades provided equivalent management services to bank customers. *Id.* The Court's analysis thus focused upon the relationship of investment advisory services to services traditionally performed by banks. The Court upheld the Board's regulation because the proposed activity constituted, in effect, the provision in a nonbanking context of services that banks have traditionally offered their customers. The Court never considered whether investment advisory

---

**5.** As enacted in 1956, § 4(c)(8) (then § 4(c)(6)) authorized bank holding companies to engage in activities "of a financial, fiduciary, or insurance nature ... which the Board ... has determined to be so closely related to *the business of banking* ... as to be a proper incident thereto." Pub.L. No. 511, § 4(c)(6), 70 Stat. 137 (1956). The Board interpreted the phrase, "the business of banking," to prohibit bank affiliation with any company whose activities were not directly related to the banking operations that the particular holding company was already engaged in. Congress in 1970 deleted the words "the business of" in order to make it

clear that the acquired company's activities need not be closely related to the acquiring holding corporation's specific banking business, but only to banking generally. *See* H.R. Conf.Rep. No. 1747, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Ad.News 5561, 5567; *National Courier Assn. v. Board of Governors,* 516 F.2d 1229, 1236 (D.C.Cir.1975). SIA thus argues that § 4(c)(8) required the Board to find that retail brokerage facilitates banking generally, and does not argue that facilitation of BAC's particular banking operations is required.

services provided to nonbank investment companies facilitate actual banking practices, and it seems quite clear that they do not. Thus both the result reached in *Investment Co. Inst.,* and the analysis the Court employed, indicate that an activity need not facilitate banking practices to be closely related to banking.

■ SIA also contends that an activity, to be closely related to banking, must be open to most banks. SIA argues that only the largest banks have the skills and resources needed to engage in retail brokerage; that banks *generally* will not be able to enter the brokerage business; and that brokerage is therefore not closely related to banking. SIA's argument ignores the Board's express finding "that the use of sophisticated techniques, resources and personnel to execute orders for the purchase or sale of securities for the account of customers is sufficiently widespread in the banking industry to justify a finding that banks generally provide securities execution services that equip them to offer the type of retail brokerage services provided by Schwab." In any event, even if the Board had found to the contrary, we could not accept SIA's conclusion. The closely related standard does not require proof that banks generally will be able to perform the proposed service, but instead principally concerns whether the proposed service is functionally related to the traditional services banks generally have performed. The interpretation SIA gives the Act would effectively preclude the nonbank affiliates of bank holding companies from providing financial services not open to the smallest

banks. We see nothing in the legislative history to suggest that Congress intended the closely related standard so greatly to restrict innovation in the financial industry. *Cf.* H.R.Conf.Rep. No. 1747, *supra,* 1970 U.S.Code Cong. & Ad.News at 5568 ("One of the asserted justifications for permitting bank holding companies to engage in activities that the Board has determined independently to be closely related to banking, is to permit the introduction of new innovative and competitive vigor into those markets which could benefit therefrom."). An inability of banks generally to engage in a proposed activity may, of course, raise questions of competitive effect or undue concentration of resources, but such questions are appropriately resolved under § 4(c)(8)'s public benefits test and not under the closely related standard.

■ Finally, SIA challenges the Board's determination that the public benefits reasonably to be expected from BAC's acquisition of Schwab will outweigh its possible adverse effects. We see no basis for disturbing the Board's conclusion. As the Fifth Circuit has recognized, *see Alabama Assn. of Ins. Agents, supra,* 533 F.2d at 246, Board determinations under the public benefits test necessarily involve some speculation, and should be upheld if reasonable. The Board's ruling here is plainly reasonable.[6] SIA further argues that the Board erred in failing to require de novo entry by BAC into the retail brokerage business. Section 4(c)(8) states that in orders under the statute "the Board *may* differentiate between activities commenced de novo and activities commenced by the ac-

---

6. The Board found that a number of public benefits are likely to result from BAC's acquisition of Schwab. The Board found that the acquisition will strengthen Schwab as a competitor by affording it access to BAC's managerial, financial, and technical resources. Noting that Schwab competes primarily on the basis of price, the Board stated that the strengthening of Schwab could induce full-line brokers to engage in greater price competition. The Board found that Schwab's affiliation with BAC, a large, internationally-known financial services company, should increase public confidence in Schwab and in discount brokers generally. Because discount brokers have been

hampered by a lack of public awareness and acceptance of their services, increased public confidence in discount brokers should enhance their ability to compete against better-known firms. Finally, the Board found that Schwab's affiliation with BAC will increase consumer convenience. For example, Schwab offices operated at branches of the Bank will reduce consumer search costs by enabling consumers to obtain a broader range of financial services at a single location than is now possible. The Board found that the acquisition is unlikely to have any significant adverse effects, such as undue concentration of resources, decreased competition, or unfair competitive practices.

104

quisition, in whole or in part, of a going concern." (emphasis supplied). Congress included this language in § 4(c)(8) because it believed that de novo entry generally has greater procompetitive effect than does entry through the acquisition of an existing competitor. *See* S.Rep. No. 1084, 91st Cong., 2d Sess., *reprinted in* 1970 U.S.Code Cong. & Ad.News 5519, 5534; H.R.Conf. Rep. No. 1747, *supra,* 1970 U.S.Code Cong. & Ad.News at 5568. SIA argues that, because many of the benefits expected to result from BAC's acquisition of Schwab could equally be achieved through de novo entry by BAC into retail brokerage, the Board must require de novo entry. We do not agree. Congress did no favor de novo entry as a goal in itself, but as a means of maximizing the procompetitive effects of activities conducted under § 4(c)(8). Here, the Board found that BAC's acquisition of Schwab will not substantially lessen competition, and will likely produce public benefits that outweigh possible adverse effects. Where, as here, entry by acquisition promotes competition as effectively as would de novo entry, and involves no significant anticompetitive effects that de novo entry would avoid, the Board has discretion to permit entry by acquisition.

The petition for review is denied; the order of the Board is affirmed.